# The President's Veto Power

Article I of the Constitution does not vest the President with the inherent power to veto portions of a bill while signing the remainder of it into law.

July 8, 1988

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

In the past few months, several commentators have suggested that Article I of the Constitution vests the President with an inherent item veto power. According to these commentators, this power is supported by the text of the Constitution, the experience in the Colonies and the States prior to the adoption of the Constitution, and other relevant constitutional materials. In our view, the text of Article I requires that any analysis of this question focus on the meaning of the term "Bill." If this term was intended to mean a legislative measure limited to one item of appropriation or to one subject, then it may be argued that the President properly may consider measures containing more than one such item or subject as more than one "Bill" and, therefore, may approve or disapprove of each separately. Under this approach, the President would have the functional equivalent of an item veto. Our review, however, of the relevant constitutional materials persuades us that there is no constitutional requirement that a "Bill" must be limited to one subject. The text and structure of Article I weigh heavily against any such conclusion. Moreover, historically "Bills" have been made by Congress to include more than one item or subject, and no President has viewed such instruments as constituting more than one bill for purposes of the veto. Indeed, the Framers foresaw the possibility that Congress might employ "the practice of tacking foreign matter to money bills," but gave no indication that this practice was inconsistent with their understanding of the term "Bill." Nor, we are constrained to conclude, does the recent commentary on this question provide persuasive support for an inherent item veto power in the President.

## I. Text and Structure

Article I, Section 7, Clause 2 of the Constitution sets forth the constitutional procedure for enacting "Bills" into law—passage by both houses of Congress and approval by the President subject to override:

> Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign

128

it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by Yeas and Nays, and the names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively.

U.S. Const. art. I, § 7, cl. 2.

After debate concerning Clause 2 was completed, James Madison proposed an amendment to ensure that Congress would not attempt to circumvent the presentment requirement by passing legislation in forms other than bills. Thus, the all-inclusive language of Clause 3:

> Every Order, Resolution, or Vote to Which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill.

U.S. Const. art. I, § 7, cl. 3.

Article I, Section 7 thus sets forth a straightforward procedure for enacting legislation, with well-defined roles for each of the political branches. After both houses of Congress have passed a bill or any other instrument intended to become law, Congress must present it to the President. The President then has two, but only two, options with respect to the instrument presented: to "approve ... it" or "not."

This scheme seems clearly to envision that Congress plays an active role in lawmaking, while the President's role, although quite formidable, is essentially passive and receptive at the veto stage. To use a literary analogy, Congress acts as the author, the President as the publisher: absent an extraordinary consensus in Congress, the President retains the ultimate authority to decide whether to "publish" the law. The question presented by the item veto is whether Article I can be understood to give the President a more active and powerful role in that process, *i.e.*, that of an editor who may delete various parts of the instrument presented without the approval of the author. Is the President limited to approving or disapproving the entire instrument presented to him, or may he pick and choose among various provisions of the instrument, signing some into law and returning the rest to Congress?

We can discern nothing in the text or structure of the Constitution suggesting that the President possesses such enhanced authority. With respect to enrolled

bills or any other completed legislative instrument, the Constitution authorizes the President only to "approve . . . *it*" or "not." (emphasis added). The Constitution does not suggest that the President may approve "parts of it" or indicate any presidential prerogative to delete or alter or revise the bill presented. Nor does the text contain any precise definition of the term "Bill" or place any restriction on the form of legislative instrument Congress may present to the President for his approval. Specifically, there is no suggestion in the Constitution that bills or other forms of congressional votes cannot contain unrelated matters in a single instrument. The absence of such provisions is particularly telling in this context since the veto clauses of the Constitution are the lengthiest, and among the most specific, provisions in the document.

Moreover, the genesis and language of Article I, Section 7, Clause 3 further reinforce the conclusion that the President does not possess item veto authority. As the debates make clear, the Framers required that "Every Order, Resolution or Vote" be presented to the President on the same terms as bills, to prevent Congress from circumventing the veto powers established in Clause 2 by enacting legislation in forms other than bills.[1] In particular, by requiring in Clause 3 the presentment to the President of "every vote to which the concurrence of the Senate and House of Representatives may be necessary," the Framers appear to have been referring to any measure, regardless of what unrelated provisions it combines, on which both houses of Congress have voted their approval. If so, Congress could avoid any limitations on the contents of "bills" by simply legislating in the form of "votes." Clause 3 thus provides particularized evidence that the Framers were well aware that Congress might seek to evade the President's veto authority through various machinations. Indeed, as we show below, in the debates during the Constitutional Convention, the Framers expressly contemplated that a bill might contain unrelated items and provisions. Significantly, therefore, the safeguard found in Clause 3 was neither a prohibition against aggregating unrelated items in a single bill nor a grant of item veto authority but rather an express requirement that *all* legislative instruments be subject to the veto. Accordingly, Clause 3 weighs against rather than supports reading into Article I an implicit prohibition against legislation that does not comport with the ideal of a single item addressing a single subject.

---

[1] It is fair to conclude that during most of the consideration of the veto power, the Convention assumed that bills would be the exclusive means of passing laws since the veto provision under discussion referred only to "Bills." On August 15, 1787, however, after all other debate concerning the veto power had been concluded, Madison "proposed that ['Jor resolve' should be added after '*bill*' in the beginning of [the veto clause] with an exception as to votes of adjournment &c." James Madison, *Notes of Debates in the Federal Convention of 1787* at 465 (1984) ("Madison's Notes"). Madison's argument in favor of the proposal was "that if the negative of the President was confined to *bills*: it would be evaded by acts under the form and name of Resolutions, votes &c." *Id* Madison reports that "after a short and rather confused conversation on the subject," the Convention rejected his proposal. *Id.*

Upon reconvening the next day, the Convention took up a motion by Edmund Randolph to reconsider Madison's suggestion, which Randolph had since "thrown into a new form " *Id.* at 466. Randolph's proposal was substantially identical to what is now Article I, Section 7, Clause 3, thus subjecting to the President's veto power not only "Every Bill," but also "Every order resolution or vote, to which the concurrence of the Senate & House of Rep's may be necessary." *Id.* Although Roger Sherman "thought it unnecessary," Randolph's proposal was overwhelmingly approved by the Convention without further debate *Id*

130

Nonetheless, Mr. Steven Glazier relies exclusively on Clause 3 in arguing in a recent article that the Constitution "grants the line item veto to the President." Stephen Glazier, *Reagan Already Has Line-Item Veto*, Wall St. J., Dec. 4, 1987, at 14. Mr. Glazier begins his analysis by correctly noting that the Framers added Clause 3 to guard against the entirely foreseeable prospect that Congress would attempt to circumvent the President's veto authority by simple semantic expedient of denominating bills as orders, resolutions, or votes. From this unassailable premise, however, Mr. Glazier leaps to the conclusion that the Constitution prohibits the aggregation of numerous items of appropriation in a single bill. But Clause 3 merely requires that any measure, however denominated, be presented to the President before it can become law; it says nothing about what may or may not be contained in the measure. In other words, a requirement of presentment of all legislative measures simply does not imply, let alone compel, any sort of limitation concerning the content of the measures presented.

More generally, the absence of a constitutionally prescribed limitation on the form of legislation subject to presidential disapproval is fully consistent with the powerful role that the Framers envisioned for the President in the lawmaking process and with their general approach to separation of powers questions. The debate in the Convention concerning the nature of the President's veto—whether it would be absolute or qualified, and if qualified, whether an override would require two-thirds or three-fourths vote in both houses—is instructive.

The debate over giving the President an absolute veto—like the King of England—was essentially a debate over whether to place the President on precisely the same footing in the lawmaking process as the other two participants. For example, the House has an absolute veto over measures originated in the Senate— no bill goes beyond the House until it is satisfied. If it is not satisfied with a measure, it can in effect send it back to the Senate with its recommendations (in the form of amendments). In similar fashion, the Senate has an absolute veto over the House; if it adds anything to or deletes anything from a bill originated in the House, it must send the amended measure back to the House for its concurrence in the change before the measure can go to the President. An absolute veto in the President would have placed him on precisely the same footing as House and Senate, able to block enactment of any law until satisfied with it.

Although the Framers gave the President and the Congress many of the same tools,[2] the Framers refrained from giving the President a full one-third partner-

---

[2] For example, if Congress presents a bill to the President containing unrelated matters, the President is faced with the same choice as is either house when presented with a bill containing unrelated matters: accept, reject, or propose amendments to the bill. The President may accept a bill by signing it, or by failing to return it to Congress within ten days U.S Const. art. I, § 7, cl. 2. Conversely, the President may reject a bill (subject to override) by returning it with his objections to the house in which it originated, or by failing to sign it when Congress prevents its return by its adjournment *Id*. Finally, the President may propose amendments to a bill by rejecting it and including proposed amendments in his veto message to Congress. In addition, like both houses of Congress, the President has the power to "recommend to [Congress'] Consideration such Measures as he shall judge necessary and expedient." U.S Const art II, § 3.

ship in the lawmaking process, qualifying his veto by a two-thirds override in both houses. Thus, while the Founders intended the President to have a powerful role in the lawmaking process, they did not intend his role to be as powerful as the House and Senate. But an item veto, and especially a line item veto, would place the President in a much more powerful position than either house of Congress, for it would enable him to delete portions of a measure and sign the remainder into law; he would not have to send the entire measure with his recommended deletions back to Congress for its reconsideration before any part of it could become law.

Is it possible that the Founders, while debating the nature of the Presidential veto, would refrain from giving him an absolute veto, and yet simply assume that he would be able to veto portions of a measure and sign the remainder into law? It seems inconceivable that such a feature of the President's veto power would have gone unremarked at the Constitutional Convention.

More important for present purposes, the funneling safeguard contained in Clause 3, in conjunction with the veto power itself, provides a potent, albeit burdensome, defense against any procedural manipulations employed by Congress to evade or dilute the presidential veto. If the President is presented with legislative instruments of unreasonable form, scope, or length, he can do what either house can do when the other house attempts to coerce its acquiescence through the attachment of unrelated riders—accept, reject, or propose amendments to, the entire measure.

To be sure, reliance on the veto itself, rather than a precise definition of a term "Bill," renders permissible a practice—tacking of unrelated riders—that has been subject to much congressional abuse, particularly in recent years. But, by granting each party in the lawmaking process a "veto" (subject to the override in the case of the President) over the proposals of the others, and the power to propose amendments to such proposals, the Framers believed that each party in the lawmaking process would have an adequate check on the other and be capable of defending its role. Alexander Hamilton made this clear in The Federalist:

> In the case for which it is chiefly designed, that of an immediate attack upon the constitutional rights of the executive, or in a case in which the public good was evidently and palpably sacrificed, a man of tolerable firmness would avail himself of his constitutional means of defense, and would listen to the admonitions of duty and responsibility. In the former supposition, his fortitude would be stimulated by his immediate interest in the power of his office; in the latter, by the probability of the sanction of his constituents who, though they would naturally incline to the legislative body in a doubtful case, would hardly suffer their partiality to delude them in a very plain case. I speak now with an eye to a magistrate possessing only a common share of firmness. There are men who, under any circumstances, will have the courage to do their duty at every hazard.

132

The Federalist No. 73, at 445 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

In short, the veto acts as its own best defense against congressional efforts to dilute the President's approval authority.

It should be noted that the decision to subject all legislative forms to the external check of a presidential veto, rather than to direct governance of internal legislative processes, is but one of many examples of the means by which the Framers sought to prevent all aggrandizement of power by any of the three branches: a system of checks and balances. The purpose—and genius—of a tripartite system of government with interdependent powers is that attempts by one branch to invade another's sphere are to be dealt with through the exercise of countervailing power by the branch whose prerogatives are being invaded, rather than through explicit procedural rules governing the internal operations of each branch. As a general premise, then, the Framers relied on the *structural* solution of competing institutional interests to ensure the integrity of governmental operations, and eschewed detailed rules directed towards the activities within each branch. The manifestation of this general trend in the context of congressional processes is Article I, Section 5, Clause 2, which provides that "[e]ach House may determine the Rules of its proceedings." The Framers' reluctance in this regard was particularly acute with respect to internal rules not susceptible of precise definition, for these would inevitably lead to time-consuming and divisive political disputes over whether a procedural norm has been followed. For example, as we discuss more fully below, Madison strenuously opposed the original versions of Article I, Section 7, Clause 1 because they contained "ambiguous" terms that would inevitably lead to futile political disputes over meaning. Moreover, such procedural disputes might ultimately be brought to the judiciary for resolution, a forum the Framers clearly viewed as ill-suited to resolve disputes between the political branches.

Any definitional limitations on bills would, of course, constitute precisely the kind of nebulous internal guideline that the Framers generally sought to avoid in preference to granting the President an institutional check such as the counterbalancing power of "veto." Accordingly, the incongruity between such an internal safeguard and the Framers' general approach to the separation of powers casts even further doubt on the implicit existence of any such constitutional limitation.

Moreover, while the protection contained in Clause 3 is consistent with the substantial symmetry of powers among the parties to the lawmaking process, restricting the form of a permissible "Bill" is not. Clause 3 ensures that nothing become law, regardless of the label affixed, unless presented to the President for his approval. An item veto or a restriction on the type of "Bill" presented, however, serves a distinct and more ambitious purpose. Rather than ensuring that all legislation is presented to the President, it directly intrudes into the legislative process by fixing the proper form that presented bills must take. Accordingly, any such restriction would be different in degree and in kind from that contained in Clause 3.

In sum, the text and structure of Article I, the intended roles of the House, the Senate, and the President in the lawmaking process, Hamilton's conclusion

that the veto power is its own best defense, and the inconsistency between any precise definition of "Bill" and the Framers' general attempt to provide structural safeguards against encroachments establish that the combination of unrelated matters in a single bill, although objectionable as a policy matter, neither transgresses constitutional norms nor affords a basis for exercising an item veto. The only conceivable basis for making a plausible contrary argument would be that longstanding and pervasive historical practice at the time of the American Founding clearly established that all legislation could encompass only one subject, and, consequently, the Framers must have intended that only such instruments could be presented to the President for his approval. Moreover, even if it could be shown that the Constitution places severe restrictions on the permissible contents of a "Bill," that showing would not establish item veto authority in the President. To the contrary, such a showing would suggest that a bill containing unrelated provisions would be void ab initio, and that the President would have no constitutional power to approve or disapprove such a bill in whole or in part. In any event, a review of the historical materials reveals that no such compelling evidence exists.

## II. Historical Evidence

As is clear from the foregoing discussion, the veto clauses of the Constitution do not expressly define the term "Bill." Rather, the original understanding of that term must be determined by examination of historical materials.

In analyzing those materials, it is first helpful to distinguish three conceptually distinct congressional practices. First, Congress aggregates numerous items of appropriation in a single appropriations bill, such as the so-called "Continuing Resolutions." Second, Congress attaches substantive provisions as "riders" to appropriations bills. Third, Congress combines unrelated substantive provisions, apart from appropriations, in a single bill. The question is whether a bill, as that term is used in the Constitution, may be constituted in these ways.

The historical evidence suggests that a bill may be so constituted, and that the Framers did not understand the Constitution to require an itemized presentment of legislation to the President or to establish some type of "germaneness" criterion for bills. These practices were known to the Framers, and have historical antecedents in the colonial and British experiences, and there is no persuasive evidence that the Framers intended to prohibit them. And, while failure to limit the contents of a bill may restrict the efficacy of the President's veto power, we are aware of no persuasive historical evidence that the Constitution authorizes the President to exercise an item veto.

### A. Constitutional Convention

The delegates to the Constitutional Convention of 1787 did not consider the meaning of the term "Bill" as an abstract or universal construct. Rather, in the context of considering the power of the House of Representatives to originate

134

money bills, and the power of the Senate to amend money bills, the Framers' discussions shed some light on what was meant to be conveyed by the term.

Specifically, we discuss the Convention's consideration and adoption of Article I, Section 7, Clause 1, giving to the House of Representatives the exclusive right to originate bills for raising revenue, but permitting amendments of such bills in the Senate. These discussions do not reveal that the Framers understood the term "Bill" to preclude the practice of including unrelated provisions in a single bill. Moreover, their discussion of that practice, and failure to object to it generally, suggest that the Framers left each house of Congress free to determine the form and contents of legislation.

1. *Adoption of Article I, Section 7, Clause 1*—A recurring topic of debate at the Convention was whether the House of Representatives should be given the exclusive right to originate money bills, and if so, whether the Senate should be permitted to propose amendments to such bills. In the British system, the House of Commons possessed the exclusive privilege of originating money bills, and the House of Lords was denied even the power to amend such bills. Some delegates to the Convention urged adoption of a similar rule, arguing that the long experience of the British should not be lightly discarded. *See* Madison's Notes at 113 (Remarks of Mr. Gerry); *id.* at 447 (Remarks of Mr. Dickenson). Others thought the British analogy inapposite in light of the Senate's distinct composition and character. *See id.* at 113 (Remarks of Messrs. Butler and Madison); *id.* at 249 (Remarks of Mr. Wilson).

Most important for present purposes, however, were discussions relating to the objection that adoption of the British model would lead the House to tack unrelated provisions to money bills. *See id.* at 113 (Remarks of Mr. Butler) ("[I]t will lead the [House of Representatives] into the practice of tacking other clauses to money bills . . . ."); *id.* at 443 (Remarks of Col. Mason) ("[I]t would introduce into the House of Rep.s the practice of tacking foreign matter to money bills . . . ."); *id.* at 444 (Remarks of Mr. Wilson). Opponents of the British model argued that by denying the Senate the power to amend *money* bills originating in the House—combined with the tacking of non-money provisions to such bills by the House, thereby depriving the Senate of its distinct power to propose amendments to the *non-money* provisions—the proposal would destroy the "deliberative liberty of the Senate," requiring it to vote up or down on the combination as originated. *See id.* at 444 (Remarks of Mr. Wilson) ("The House of Rep.s will insert other things in money bills, and by making them conditions of each other, destroy the deliberative liberty of the Senate."); 2 *The Records of the Federal Convention of 1787* at 210–11 (Max Farrand ed., 1987) ("M. Farrand") (Notes of James McHenry) ("[L]odging in the house of representatives the sole right of raising and appropriating money, upon which the Senate had only a negative, gave to that branch an inordinate power in the constitution, which must end in its destruction."). The Convention sought to obviate this objection by permitting the Senate to propose amendments to money bills as in the case of other bills. Although opponents of the proposal conceded that this relieved some of the diffi-

135

culties, they insisted that others remained. In the end, however, the Convention adopted a similar proposal.

Originally, it was proposed that "all bills for raising or appropriating money . . . shall originate in the 1st branch of the Legislature, and shall not be altered or amended by the 2d branch." Madison's Notes at 237. Building on the earlier argument that this provision would lead to tacking, James Madison, among others, observed that it would be "a source of injurious altercations between the two Houses." *Id.* at 414 (Remarks of Mr. Madison); *see also id.* at 238 (Remarks of Mr. Madison) (referring to the provision as "a source of frequent & obstinate altercations"); *id.* at 251 (Remarks of Gov. Morris) ("It will be a dangerous source of disputes between the two Houses."); *id.* at 444 (Remarks of Mr. Wilson) ("[A]n insuperable - objection agst. the proposed restriction of money bills to the H. of Rep.s [is] that it would be source of perpetual contentions where there was no mediator to decide them . . . ."); *id.* at 449 (Remarks of Mr. Rutledge) ("The experiment in S. Carolina, where the Senate cannot originate or amend money bills, has shewn that it answers no good purpose; and produces the very bad one of continually dividing & heating the two houses.").

"[I]n order to obviate the inconveniences urged agst. a restriction of the Senate to a simple affirmative or negative," Edmund Randolph proposed that the clause be changed to permit the Senate to amend money bills except as to "increase or diminish the sum." *Id.* at 436–37. Col. Mason argued in favor of this change, stating: "By authorizing amendments in the Senate it got rid of the objections that the Senate could not correct errors of any sort, & that it would introduce into the House of Rep.s the practice of tacking foreign matter to money bills." *Id.* at 443. James Madison, a consistent opponent of the proposals to restrict the Senate in favor of the House, admitted that "[t]he proposed substitute . . . in some respects lessened the objections agst. the section," but also thought that "[i]t laid a foundation for new difficulties and disputes between the two houses." *Id.* at 445 (Remarks of Mr. Madison). Of particular relevance for our purposes, Madison made the following observation:

> The words *amend or alter*, form an equal source of doubt & altercation. When an obnoxious paragraph shall be sent down from the Senate to the House of Reps—it will be called an origination under the name of an amendment. The Senate may actually couch extraneous matter under that name. In these cases, the question will turn on the *degree* of connection between the matter & object of the bill and the alteration or amendment offered to it. Can there be a more fruitful source of dispute, or a kind of dispute more difficult to be settled? His apprehensions on this point were not conjectural. Disputes had actually flowed from this source in Virga. where the Senate can originate no bill.

*Id.* at 446. Randolph did not respond to this new objection. Rather, he reiterated his support for the proposal, stating that "[h]is principal object . . . was to pre-

vent popular objections against the [constitutional] plan, and to secure its adoption." *Id.* at 448. After some additional discussion, the Convention rejected the proposal to vest in the House the exclusive right to originate money bills, even though it would have permitted some amendment in the Senate. *Id.* at 449–50.

Although the Convention finally had acted to reject the proposal, some members continued to feel strongly that some form of it was necessary, given that the States were to be equally represented in the Senate. For example, in discussing a proposal making members of Congress ineligible to hold other offices, Hugh Williamson referred "to the question concerning 'money bills.'"

> That clause he said was dead. Its ghost he was afraid would notwithstanding haunt us. It had been a matter of conscience with him, to insist upon it as long as there was hope of retaining it. He had swallowed the vote of rejection, with reluctance. He could not digest it.

*Id.* at 453–54.

Immediately upon reconvening the next day, the Convention took up a motion by Caleb Strong to adopt a new proposal relating to money bills. Mr. Strong suggested that the House be given the exclusive right to originate money bills, but that the Senate be permitted to "propose or concur with amendments as in other cases," thus permitting the greatest role yet for the Senate. *Id.* at 460. Col. Mason and Mr. Ghorum strongly supported the proposal and urged its adoption. Gouverneur Morris, however, "opposed it as unnecessary and inconvenient." *Id.* Mr. Williamson then gave the last significant speech to the Convention on the merits of adopting a provision on money bills, which appears to have been instrumental in the ultimate decision to adopt such a provision:

> [S]ome think this restriction on the Senate essential to liberty, others think it of no importance. Why should not the former be indulged. [H]e was for an efficient and stable Govt. but many would not strengthen the Senate if not restricted in the case of money bills. The friends of the Senate would therefore lose more than they would gain by refusing to gratify the other side. He moved to postpone the subject till the powers of the Senate should be gone over.

*Id.* at 460–61. Mr. Williamson's motion to postpone "passed in the affirmative." *Id.* at 461.

Three weeks later on September 5, 1787, the Committee on Unresolved Matters reported the following proposal:

> All bills for raising revenue shall originate in the House of Representatives, and shall be subject to alterations and amendments by the Senate: no money shall be drawn from the Treasury, but in consequence of appropriations made by law.

137

*Id.* at 580. This proposal represented a significant change. The proposal gave the Senate the right to propose amendments of any sort, and this provision referred only to "bills for raising revenue" rather than "bills for raising or appropriating money,"[3] in defining the extent of the House's exclusive right of origination. Gouverneur Morris moved to postpone consideration of the proposal, stating: "It had been agreed to in the Committee on the ground of compromise, and he should feel himself at liberty to dissent to it, if on the whole he should not be satisfied with certain other parts to be settled." *Id.* at 581 (footnote omitted). "Mr. Sherman was for giving immediate ease to those who looked on this clause as of great moment, and for trusting to their concurrence in other proper measures." *Id.* The Convention then voted to postpone. *Id.*

In the final days of the Convention, the proposal was again taken up. Without debate, the Convention adopted a motion to substitute "the words used in the Constitution of Massachusetts" for those used by the Committee to permit amendments by the Senate. *Id.* at 607. The proposal was then adopted as amended, by a vote of nine to two, providing as follows:

> All bills for raising revenue shall originate in the House of Representatives; but the Senate may propose or concur with amendments as in other bills. No money shall be drawn from the Treasury but in consequence of appropriations made by law.

*Id.* at 606–07.[4] James McHenry subsequently described the compromise that led to the adoption of the clause as follows: "The Larger States hoped for an advantage by confirming this privilege [of originating revenue bills] to that Branch where their numbers predominated, and it ended in a compromise by which the Lesser States obtained a power of amendment in the Senate." *See* 3 M. Farrand at 148 (Remarks of James McHenry before the Maryland House of Delegates, Nov. 29, 1787).

2. *Analysis of Article 1, Section 7, Clause 1*—Those in favor of inherent item veto authority may argue that the history of the adoption of Clause 1 of Article I, Section 7 indicates that the Constitution adopts as the meaning of the term "Bill" a legislative proposal limited to one subject. From this premise, as noted earlier, it might be argued that the President is entitled to treat any legislative instrument containing more than one subject as more than one bill.[5] The difficulty, however, is that the Framers gave no indication that they meant to limit the term "Bill" to legislative instruments relating to only one subject. Rather, as previ-

---

[3] Several of the earlier proposals also would have given the House the exclusive right to originate bills "for fixing the salaries of the officers of Government." *See, e.g.,* Madison's Notes at 386.

[4] The clause was subsequently altered only by moving the second sentence to Article I, Section 9. *Id* at 619.

[5] Moreover, as previously discussed, even if the latter understanding had been adopted by the Convention, item veto authority would not necessarily follow Rather, it might be concluded that such proposals could not be passed or presented to the President, and that even if the President signed such a proposal, it would have no legal force or effect.

ously discussed, their apprehension concerning the possible content of the bills originating in the House and resulting from amendment in the Senate arose solely out of their concern that neither house be in a position to encroach upon the constitutional prerogatives of the other.

That the Constitution does permit bills to contain unrelated provisions is reflected by the objection of some Convention delegates that the House might engage in "the practice of tacking foreign matter to money bills." *E.g.*, Madison's Notes at 443 (Remarks of Col. Mason). To be sure, it might be argued that these objections imply that the Framers did not understand the term "Bill" to permit the tacking of foreign matter. This inference is unwarranted. Rather, these comments reflect an explicit recognition by the Framers that a bill could contain unrelated provisions, for the Framers recognized the practice, yet took no steps to prevent the houses from engaging in it. *See* 3 M. Farrand at 202 (Remarks of Luther Martin delivered to the Maryland legislature on November 29, 1787) (objecting to Article I, Section 7, Clause 1 on the ground "[t]hat it may, and probably will, be a future source of dispute and controversy between the two branches, what are or are not revenue bills, and the more so as they are not *defined* in the constitution").

Moreover, the Framers' objection was not to tacking as such. The Convention delegates were agreed that the House and Senate should be given equal authority to originate and amend all bills other than those dealing with money. The objection to tacking arose only in reaction to the proposal to give the House exclusive power to originate bills raising and appropriating money. The objection was quite specific: the tacking of non-money riders to money bills by the House of Representatives would enable the House to use its power to originate money bills to encroach upon the constitutional prerogative of the Senate to amend non-money proposals. *See* 2 M. Farrand at 210–11 (Notes of James McHenry) (arguing against "lodging in the house of representatives the sole right of raising and appropriating money, upon which the Senate had only a negative," on the ground "[t]hat without equal powers they were not an equal check upon each other"). This view is confirmed by the fact that once Randolph proposed to change the proposal to permit the Senate to amend non-money provisions of bills originated in the House, Col. Mason remarked that the change "got rid of the objection[] . . . that it would introduce into the House of Reps. the practice of tacking foreign matter to money bills." Madison's Notes at 443. Thus, although either or both houses remained free to combine unrelated non-money provisions, it is not surprising that no one at the Convention objected to, or even raised, that possibility, since the practice did not threaten to permit one house to enlarge its power at the expense of the other. Nor were there references in the debates to the possibility that the House might combine two unrelated money provisions in a single bill, because no prerogative of the Senate thereby would have been encroached. This, in turn, suggests that the Convention would have had no reason to object to, let alone consider, the practice of tacking when both houses stood on equal footing—namely, when the House tacks unrelated non-money matters to non-money bills. *Accord* Madison's Notes at 114 (Remarks of Mr. Sherman)

("In Cont. both branches can originate in all cases, and it has been found safe & convenient.").[6]

That the Constitution does not adopt a definition of the term "Bill" that either authorizes or prohibits unrelated provisions is also consistent with Article I, Section 5, Clause 2, which provides that "[e]ach House may determine the Rules of its Proceedings." By this provision, the Constitution appears to leave it to each house to permit or prohibit tacking under any or all circumstances.

Madison's remarks in response to Randolph's compromise are not to the contrary. As noted, Madison acknowledged that "[t]he proposed substitute . . . in some respects lessened the objections agst. the section," but stated that "[t]he words *amend or alter*, form an equal source of doubt & altercation." Madison's Notes at 445–46. Madison stated that the question whether an amendment is properly characterized as an origination "will turn on the *degree* of connection between the matter & object of the bill and the alteration or amendment offered to it." *Id.* at 446. Proponents of inherent item veto authority might argue that this statement evinces an understanding that only a germane amendment properly may be characterized as an "amendment," and therefore that a bill may not be amended to contain unrelated provisions.

Madison's observation does not appear to have been designed to state a constitutional definition of "amendment," but rather to persuade the Convention that *any* proposal that placed the houses on an unequal footing with respect to money bills would lead to disputes and altercations between them. Thus, Madison predicted that when the Senate proposed an amendment "obnoxious" to the House, the houses would enter into a dispute over whether the Senate had proposed "an origination under the name of an amendment." *Id.* at 446. Read in context, it is clear that Madison's statement of the considerations upon which "the question will turn" was not intended as a statement of a constitutionally required definition of "amendment," but rather to demonstrate the inevitability of disputes that would be difficult to resolve. Thus, immediately after making this statement, Madison asked rhetorically: "Can there be a more fruitful source of dispute, or a kind of dispute more difficult to be settled?" *Id.* Any other reading would require one to reach the strange conclusion that Madison was simultaneously proposing a constitutional test and criticizing it as incapable of being successfully applied.

That Madison's purpose was limited to pointing out the weakness of Randolph's proposal is confirmed by an examination of his entire statement. Madison begins by pointing out that "[t]he word *revenue* was ambiguous," and that "no line could be drawn between" revenue and non-revenue provisions. *Id.* at 445–46. Next, Madison made his argument that "[t]he words *amend or alter*, form an equal source of doubt & altercation." *Id.* at 446. Finally, Madison states that other terms in Randolph's proposal "were liable to the same objections." *Id.* Accordingly, Madison's point was not that non-germane amendments would be

---

[6] Similarly, no delegate suggested that tacked matters were two bills, or that a legislative proposal relating to more than one subject would not be a proper bill.

unconstitutional, but simply that giving the House and Senate unequal power over money bills would invariably lead to political disputes.

Thus, we believe that the debates in the Convention concerning the adoption of Clause 1 are informative primarily because of the absence of discussion concerning tacking outside the context of the money bill proposal. If the Framers truly believed that a bill could relate to only one subject, then it is remarkable that they did not state this belief even when tacking was discussed. Under these circumstances, rather than indicating a restriction on the contents of a bill, the Framers' discussions concerning the adoption of Clause 1 actually suggest that a bill may contain unrelated matters.

The Framers' discussion of Clause 1 has obvious relevance for interpreting the veto clauses. The Framers used the term "Bill" in both instances, raising a textual presumption that the term was intended to have the same meaning throughout. Moreover, there is no evidence suggesting that the Framers had different conceptions of the term "Bill" as used in these clauses. Rather, the fact that the revenue clause immediately precedes the veto provisions in the Constitution, and that all are part of the same section, Article I, Section 7, provide additional and persuasive evidence that the Framers did not intend to limit the contents of bills to a single subject.

## B. Ratification Debates

Although the veto clauses of the Constitution were not widely discussed in the state ratifying conventions, the little discussion that occurred, and the fact that no one suggested that the President had item veto authority, indicate that the ratifiers did not understand the Constitution to grant the President item veto authority.

Most of the comments were limited to a recitation of the mechanics of the veto. For example, in the Pennsylvania ratifying convention, James Wilson quoted from the veto clauses and stated that "[t]he *effect* of this power, upon this subject, is merely this: if he disapproves a bill, two thirds of the legislature become necessary to pass it into a law, instead of a bare majority." 2 *Debates on the Adoption of the Federal Constitution* 473 (Jonathan Elliot, ed., 1836) ("Elliot's Debates"). Wilson's understanding confirms what is evident on the face of the Constitution—the President has two choices when presented with a bill: to approve or disapprove the bill. Of course, this understanding leaves open to discussion what may constitute a bill for constitutional purposes, but Mr. Wilson did not address this question.

James Iredell's discussion of the veto power in the North Carolina ratifying convention evinces a similar understanding. Responding to criticism that the veto power gave the President too great a role in legislation, Iredell stated:

> After a bill is passed by both houses, it is to be shown to the President. Within a certain time, he is to return it. If he disapproves of it, he is to state his objections in writing; and it depends on Con-

gress afterwards to say whether it shall be a law or not. Now, sir, I humbly apprehend that, whether a law passes by a bare majority, or by two thirds, (which are required to concur after he shall have stated objections,) what gives active operation to it is, the will of the senators and representatives. *The President has no power of legislation.* If he does not object, the law passes by a bare majority; and if he objects, it passes by two thirds. *His power extends only to cause it to be reconsidered,* which secures a greater probability of its being good.

4 Elliot's Debates at 27 (emphasis added). Iredell's defense of the veto power indicates his understanding that the power was limited in nature. The President was to have no power to adopt or alter legislation on his own. Rather, his role was limited to initiating reconsideration and requiring greater consensus in Congress by withholding his consent, and to proposing alterations by communicating his objections to Congress. Congress might assent to his objections and amend the bill, but this would be done by Congress and not be any unilateral action of the President. Moreover, although Iredell's comments do not speak to whether there are any constitutional limitations on what Congress may include in a single bill, his remarks indicate that he would have found it worthy of comment if he understood the Constitution to permit the President to exercise, in effect, an item veto by conferring upon him the power to decide what does and does not constitute a bill.

## C. British Experience

An examination of the British experience indicates that legislative instruments containing unrelated provisions were treated as one bill. Appropriations bills regularly contained multiple items, and there was no objection to such bills. The practices of including unrelated substantive provisions in a single legislative instrument, and attaching substantive riders to money bills, were sometimes engaged in, but met with objections. On several notable occasions, these objections led the Crown and the House of Lords to refuse their assent to such measures. There was, however, no suggestion by either the Crown or the Lords that these measures could be treated as more than one bill and approved or vetoed separately.

A review of British supply bills, as they were called, enacted prior to the revolutionary war indicates that it was not unusual for a single bill to contain numerous items of appropriation. For example, a bill enacted in 1765 contained thirty-one separate sections and at least as many items of appropriation. *See* An act for granting to his Majesty a certain sum of money out of the sinking fund; for applying certain moneys therein mentioned for the service of the year one thousand seven hundred and sixty five; for further appropriating the supplies granted in this session of parliament; for allowing to the receivers general of the duties on offices and employments in Scotland a reward for their trouble; and for

allowing further time to such persons as have omitted to make and file affidavits of the execution of indentures of clerks to attorneys and solicitors, 1765, 5 Geo. 3, ch. 40. This bill included appropriations "towards discharging such unsatisfied claims and demands, for expenses incurred during the late war in *Germany*," *id.* § 12, for "defending, protecting, and securing, the *British* Colonies and plantations in *America*," *id.* § 13, for maintaining "his Majesty's navy," *id.* § 15, "for paying of pensions to the widows" of deceased officers and marines, and "towards defraying the charge of out-pensioners of *Chelsea* hospital," *id.* § 20, "for defraying the charges of the civil establishment of his Majesty's colony of *West Florida*, . . . and . . . for defraying the expense attending general surveys of his Majesty's dominions in *North America*," *id.* § 22. In addition, we are aware of no secondary sources that call this practice into question. Thus, a British bill of supply might properly contain numerous items of appropriation.

Historical evidence also suggests that the practice of combining unrelated matters in a single bill occurred with some frequency, and gave rise to considerable controversy and debate. According to one commentator:

> A very objectionable course was sometimes adopted by the Commons in the reign of Charles II which, if it had not been subsequently exploded, would have been a blemish in the constitution, namely, *the practice of tacking bills of supply, with an intention of thereby compelling the Crown or the Lords to give their consent to a bill which they might otherwise disapprove of and reject.* The practice of tacking indicates that the mode of passing bills between the two Houses was unsettled in the reign of Charles II. . . . [The practice] survived the revolution, but is now deemed unconstitutional.

Amos, *The Constitutional History of England in the Time of Charles II, quoted in* 9 Cong. Rec. 235 (1879) (emphasis added).

An authoritative four-volume treatise by John Hatsell on parliamentary practice details many of the relevant events.[7] Hatsell's general observations on the subject are as follows:

> It is much to be wished that every question, which is brought either before the House of lords or Commons, should be as simple and as little complicated as possible. *For this reason, the proceeding, that is but too often practised, of putting together in the*

---

[7] In the preface to his Manual on Parliamentary Practice, Thomas Jefferson refers to Hatsell's work, stating "I could not doubt the necessity of quoting the sources of my information, among which Mr. Hatsel's [sic] most valuable book is preeminent." H.R Doc. No. 279, 99th Cong , 2d Sess. 113 (1987).

According to another commentator, "Hatsell's collection of parliamentary precedents is the highest authority in parliamentary law known either in Great Britain or the United States, and the work from which Jefferson's Manual, or hand-book, is chiefly compiled." 21 Cong. Globe, 31st Cong., 1st Sess. 794 (1850) (remarks of Senator Benton).

> same Bill clauses that have no relation to each other, and the sub-
> jects of which are entirely different, ought to be avoided. Even
> where the propositions are separately not liable to objection in ei-
> ther House, the heaping together in one law such a variety of un-
> connected and discordant subjects, is unparliamentary; and tends
> only to mislead and confound those who have occasion to consult
> the Statute Book upon any particular point. But to do this in cases
> where it is known that one of the component parts of the Bill will
> be disagreeable to the Crown, or to the Lords; and that, if it was
> sent up alone, it would not be agreed to—for this reason, and with
> a view to secure the Royal assent, or the concurrence of the Lords,
> to tack it to a Bill of Supply which the exigencies of the State make
> necessary is a proceeding highly dangerous and unconstitutional.
> It tends to provoke the other branches of the legislature, in their
> turn, to depart from those rules to which they ought to be restrained
> by the long and established forms of Parliament; and can have no
> other effect than finally to introduce disorder and confusion.

3 J. Hatsell, *Precedents of Proceedings in the House of Commons* 221–22 (1818) (emphasis added).

For our purposes, it is important that the practice of combining unrelated matters in a single bill, however objectionable, was widely known. For example, Hatsell quotes a speech on the subject by Lord Chancellor Finch made to both houses on May 23, 1678, which admonished:

> The late way of tacking together several independent and inco-
> herent matters in one Bill, seems to alter the whole frame and con-
> stitution of Parliaments, and consequently of the government it-
> self. It takes away the King's negative voice in a manner, and
> forces him to take all or none; when sometimes one part of the
> Bill may be as dangerous for the kingdom, as the other is neces-
> sary.

3 J. Hatsell, at 224 n.+. The difficulty reached such proportions that in 1702, the House of Lords was moved to adopt the following resolution, to be included among their standing orders: "That the annexing of any clause or clauses to a Bill of Aid or Supply, the matter of which is foreign to, and different from, the matter of the said Bill of Aid or Supply, is unparliamentary, and tends to the destruction of the constitution of this government." *Id.* at 218 n.+.

Although the practice of combining unrelated matters in a single bill was the subject of much criticism and recognized to be contrary to the proper constitution and functioning of the British government, it also appears to have been common ground that the House of Commons could (and often did) combine such matters in a single bill, and that the only recourse of the House of Lords and the Crown was to withhold their assent. Given this understanding, the Framers' ex-

plicit recognition that the House of Representatives might adopt a similar practice to coerce the Senate, and their failure to adopt a provision prohibiting the practice (such as a constitutional limitation on the contents of bills), it appears that the Framers believed that each branch had adequate tools at its disposal to defend itself against attempts at coercion by another.

## D. Colonial Experience

Legislation by the American Colonies was subject to review by both the colonial governors and the Crown. Bills passed by the colonial legislatures required the approval of the governor in order to become laws. After being enacted, however, colonial laws were also sent to England to be reviewed by the Crown. Although the practice of the governors and the Crown was not entirely uniform, evidence indicates that they did not exercise an item veto, but instead approved or disapproved an entire legislative measure.

1. *Review of Colonial Legislation by the Colonial Governors*—Legislative power in most of the Colonies was exercised jointly by the assembly, the governor's council and the governor. Bills passed by the assembly and the governor's council were presented to the governor, who had an absolute veto over them.[8] The Crown expected the governor to represent its interests, and issued instructions requiring him to disapprove certain bills. The governor's position in the legislative process was supported by his council, whose members were usually appointed upon his recommendation. *Id.* at 72.

In a recent article in the *Wall Street Journal*, Professor Forrest McDonald, an eminent constitutional historian, argues that the Framers understood the veto power as incorporating the power to disapprove parts of a bill because "in each of the forms in which Americans had encountered it, the veto was of a 'line-item' nature."[9] Professor McDonald cites three principal uses of the veto with which the Framers had experience: the veto of the colonial governors, the review of colonial legislation by the Privy Council, and the veto as exercised in the States after independence. Concerning the veto of the colonial governors, Professor McDonald states that this veto was "exercised selectively" to disapprove parts of a bill and cites two examples.[10]

Our review of historical materials, however, reveals that colonial governors did not have the power to veto parts of a bill. Rather, according to Evarts B. Greene's *The Provincial Governor in the English Colonies of North America* 122 (1966), the governor "had himself only a right of veto upon appropriation bills as a whole."[11] Moreover, in *Royal Government in America* 219 (1930), Leonard

---

[8] *See* E.B. Greene, *The Provincial Governor in the English Colonies of North America* 162 (1966).

[9] Forrest McDonald, *Line-Item Veto: Older Than Constitution*, Wall St. J., Mar. 7, 1988, at 16.

[10] Professor McDonald's Wall Street Journal article does not provide any citations for its claims or even its quotes. On February 20, 1988, approximately two weeks before the article was published, Professor McDonald sent a letter to Lewis Uhler of the National Tax-Limitation Committee, which closely tracks the article and does provide sources. We shall refer to this letter at appropriate points.

[11] In Professor McDonald's letter, he states that "[t]he authority on the veto power of the colonial governors is Evarts B. Greene," and does not cite any other works.

Labaree states that the governor "had very little to do with bills until they had been passed by the council and assembly and then he could only accept or reject them as they stood."[12]

The relationship between the governor and the legislative assemblies also suggests that the governor could not exercise an item veto. In their efforts to resist the power of the Crown, the assemblies sought to coerce the governor to approve bills to which the Crown objected. Greene writes that the assemblies engaged in the "practice, pursued in direct defiance of the royal instructions, of inserting items entirely foreign to the main body of the bill, of attaching legislative riders to bills appropriating money."[13] Another commentator states:

> The most serious difficulty in colonial government was one growing out of the gradual revolution which was taking pace in the Colonies due to the rising power of the assemblies. This movement had scarcely begun in 1696 when the Board was organized, but it developed rapidly and was almost complete by 1765. The assemblies, through their assumed power over what they chose to call a money bill, were able to usurp the chief legislative powers of the council by denying to that body the right to amend proposed financial measures, thus rendering it powerless to assist the governor in carrying out his instructions. With the council eliminated and with full control of the purse in their own hands, the assemblies proceeded to force the governors to sign forbidden legislation and to strip them of their executive functions. By designating officers by name in the appropriation bills the assemblies forced the governors to appoint such persons to office as were pleasing to itself, extraordinary and even ordinary executive duties were delegated to committees of the lower house, and finally the control of the military was assumed, so that the governors were reduced to little more than figureheads.

---

[12] *Accord,* Paul R Q. Wolfson, *Is a Presidential Item Veto Constitutional?*, 96 Yale L.J. 838, 842–43 (1987) ("Unamendability meant that the colonial governors and upper houses had to accept all items of appropriation in money bills or reject them all ").

[13] E.B. Greene, *The Provincial Governor in the English Colonies of North America* 164 (1966) Robert Luce writes that "[i]n the colonial assemblies of America the obnoxious practice [of combining unrelated subjects in a single bill] became familiar " Although he notes that some examples of this practice were due to "indifference or carelessness" or "unfamiliarity with the canons of correct law-drafting," he states that "[t]here is, however, good ground for suspicion that most of the mischief was deliberately planned, in order to compel the home authorities to approve dubious items attached to proposals evidently desirable and important." Indeed, Luce notes that "[w]ith the quarrels of the period leading up to the Revolution, the colonists resorted to the practice with provoking frequency and boldness." Robert Luce, *Legislative Procedure* 549–50 (1922). In *The Review of American Colonial Legislation by the King in Council* 207 (1915) ("Russell"), Elmer Russell notes the practice of the Colonies including "provisions upon unrelated subjects within the same enactment," but places a different emphasis upon it than do Greene and Luce. Russell states that "[i]n the majority of cases [the practice] was due to ignorance or carelessness." *Id* However, "[w]hen, in rare instances, this expedient was used to circumvent the [Crown], the objectionable provision was usually inserted as a rider to a supply act." *Id* at 208.

Oliver Morton Dickerson, *American Colonial Government 1696–1765* at 361–62 (1962). If the governor had the authority to veto parts of a bill, however, the devices described could not have coerced the governor.

The two examples of an item veto offered by Professor McDonald do not lead to a contrary conclusion. Professor McDonald first claims that the "best known examples" of item vetoes exercised by the colonial governors "are those of the proprietary governors of Pennsylvania and Maryland, who repeatedly vetoed specific provisions of military appropriations bills during the French and Indian War of 1756–63."[14] In McDonald's letter to Lewis Uhler, he cites E.B. Greene's *The Provincial Governor in the English Colonies of North America* as specific authority for this claim.

As quoted above, both Greene and Labaree state that the governor had only a general negative. Moreover, with respect to this incident, a review of Greene's book reveals only the statement that during the period of the French and Indian wars, the assemblies of Pennsylvania and Maryland "passed supply bills which included taxes on the estates of the proprietors," and the proprietors' "refusal . . . to permit such taxes led to prolonged and angry deadlocks."[15] E.B. Greene, *The Provincial Governor in the English Colonies of North America* 13 (1966). This certainly does not expressly state that the governors had item veto authority, nor does it suggest an inference that they did. Indeed, to the extent one were to engage in conjecture, the most plausible inference is that the deadlocks were the result of the governor's opposition to the entire supply bills, for item veto authority would have permitted him to approve the parts of the bills of which he approved.

As his second example, Professor McDonald claims that colonial governors exercised item veto authority with respect to the appointment of members of their councils. McDonald asserts that the governors councils were selected by legislative enactment, but that the governors had "the power to reject individual selections, even though all the choices were presented together in the same bill." Forrest McDonald, *Line Item Veto: Older Than Constitution*, Wall St. J., Mar. 7, 1988, at 16. Greene's book states, however, that except for Pennsylvania and Massachusetts, council members were chosen by the Crown, usually upon the recommendation of the governor. In Pennsylvania, moreover, council members were chosen by the governor, subject to some participation by the council itself, but not the assembly.

McDonald's claim that council members were selected by legislative enactment is only plausible in Massachusetts, where the council members were elected by the assembly and the council, subject to the governor's veto. Greene's book does not state that the results of the elections were transmitted to the governor

---

[14] Forrest McDonald, *Line-Item Veto Older Than Constitution*, Wall St J , Mar. 7, 1988, at 16.

[15] Greene also states that "during the years 1753–1759," there was "a stormy period of conflict [in Maryland politics] between the governor and the assembly over supply bills " However, "during the six years there is no record of any veto by the governor: all bills presented to him were approved, and this fact clearly indicates that obnoxious legislation was blocked by the upper house " *Id.* at 87

together as a single legislative enactment. Even if the names of those elected were communicated to the governor in a group, it does not follow that the assembly voted to elect the appointees as a group. Moreover, even if the assembly did vote on appointees collectively rather than individually, there is no reason to conclude that the governor possessed an item veto with respect to legislation even though the governor often, if not always, rejected fewer than all the elected candidates. Enactments presenting the results of a legislative election are quite distinct from legislation passed in the form of bills. In any event, whatever its precise nature, the practice occurred in only one state. Thus, neither example provided by Professor McDonald presents evidence of the existence of item veto authority in the colonial governors over legislation.

Finally, the colonists' practice, noted above, of combining unrelated items in a single bill also suggests that they did not understand the term "Bill" to mean a legislative measure relating to only one subject. Despite the Crown's objection to laws containing unrelated provisions, the colonists did not share this understanding of legislation. Rather, as previously discussed, they included unrelated subjects in a single bill as a result of indifference, carelessness, and the desire to coerce the crown's approval. It is particularly clear, moreover, that the colonists believed that items of appropriation could be aggregated in a single bill. Greene writes that "a glance at the statute books of almost any colony will show that, by the close of the colonial era, the general rule consisted in making detailed appropriations for short periods of time." Greene at 122. Our independent review of colonial appropriations laws confirms that the colonists aggregated items of appropriation in a single law.[16]

In sum, we are aware of no evidence indicating that a colonial governor exercised an item veto with respect to colonial legislation. Rather, the uniform practice appears to have been that the governor "could only accept or reject bills as they stood."[17]

2. *Review of Colonial Legislation by the Privy Council*—In addition to its authority over colonial legislation exercised through the governors, the Crown also reviewed colonial laws through the Privy Council.[18] This review permitted the Crown to exercise central control over the Colonies, and was mainly conducted to ensure the conformity of colonial laws with the laws of England, to protect the prerogatives of the Crown, and to further colonial policy.

In his recent article in the *Wall Street Journal*, Professor McDonald states that the "American colonists' most extensive experience with a veto had been through the British government's power to review acts passed by the colonial legislatures." He writes that the Board of Trade, on behalf of the Crown, disallowed—

---

[16] *See, e.g.*, 5 New York Colonial Laws 27 (passed 1770).

[17] Leonard Woods Labaree, *Royal Government in America* 219 (1930).

[18] Over the years, the Privy Council relied upon numerous committees and boards to review, and make recommendations concerning, colonial legislation. The most important of these boards was the Board of Trade, established in 1696. For ease of exposition, we will usually refer to the actions of the Privy Council, omitting the role of the subordinate boards, except when relevant.

"in whole or in part"—469 acts passed by the Colonies. Professor McDonald claims that the Board of Trade "exercised such a line-item veto many times," and cites as an example the alleged item veto in 1764 of a clause in a Massachusetts revenue act.[19]

The veto exercised by the Privy Council, however, differed in significant respects from examples of the veto power in the Colonies, States, and Federal Government. The Privy Council generally reviewed laws that were already in effect rather than approving bills as part of the legislative process.[20] The Council's review power therefore did not strictly involve the exercise of a veto, but was similar to a power of repeal. Moreover, as there was no requirement in most cases that the Privy Council review legislation within any time period, a majority of the laws reviewed by the Board of Trade were never formally acted upon by the Council and some laws were reviewed many years after their enactment. Russell at 54. These distinguishing characteristics of the veto exercised by the Privy Council preclude significant reliance upon any particular feature of it as a model for the President's veto power.[21] While the Framers were familiar with the exercise of the Crown's veto, they conferred a substantially different veto power upon the President.

To the extent that the nature of the Crown's veto is instructive of the Framers' understanding, however, examination of its use supports the conclusion that the President does not have authority to disapprove parts of a bill. A review of historical materials indicates that, for the nearly one hundred years between the late 1680s and the American Revolution—the period most revealing of the colonists' understanding of the nature of a veto—the Council never vetoed part of a legislative enactment. Although the Council did exercise two item vetoes prior to that time, in 1665 and 1680, these incidents were not repeated and appear to have

---

[19] Forrest McDonald, *Line-Item Veto Older Than Constitution*, Wall St J., Mar. 7, 1988, at 16. In his letter to Lewis Uhler, Professor McDonald states that "[t]he authority on this subject is Elmer B. Russell, The Review of American Colonial Legislation by the King in Council (New York, Columbia Univ , 1915) " Russell's book, upon which we also rely heavily, is based on a review of the actual vetoes exercised by the Crown, as described in the journals of the board of Trade, located in the Public Record Office in London. It is therefore a work that is particularly suited to our purposes. Other important sources, however, include Oliver Morton Dickerson, *American Colonial Government 1696 - 1765. A Study of the British Board of Trade in its Relation to the American Colonies, Political, Industrial, Administrative* (1962); Leonard Woods Labaree, *Royal Government in America* (1930)

[20] Certain kinds of colonial legislation, however, were suspended from taking effect until receiving the approval of the Crown. Examples include private acts and legislation repealing other laws. Leonard Woods Labaree, *Royal Government in America* 227 (1930), Russell at 214

[21] If, contrary to our research, there is evidence that the Privy Council had the power to veto parts of a bill, the differences between that body and the President would argue against recognizing a similar power in the President. Since the colonial laws would have already been in operation and relied upon by the colonists, there would be an additional reason to sever only those parts considered objectionable by the Council Moreover, the fact that the laws were in operation and that the council exercised the (judicial) power to reject the laws as contrary to the charters of the Colonies, would suggest that the Council was exercising a power analogous to judicial review rather than the veto, permitting the Council to sever objectionable parts of the statute. *See* Russell at 227 (Privy Council's review precedent for power of judicial review); Oliver Morton Dickerson, *American Colonial Government 1696–1765* at 365 (1962) (same). We discuss at greater length below why the availability of judicial review fails to support the existence of item veto authority.

149

been regarded as isolated departures from the rules governing the exercise of the Council's proper review power.

Systematic review of legislation by the Privy Council began after 1660, but the practice governing this review appears not to have been finalized until some years later.[22] Thus, in the late 1670s the Crown sought to limit the power of the Jamaican Assembly to approving or disapproving laws drafted in England. The successful resistance of the Jamaican Assembly to approving or disapproving laws drafted in England. The successful resistance of the Jamaican Assembly to this attempt helped clearly to establish the power of colonial assemblies to initiate legislation.[23]

At approximately the same time, the Privy Council exercised two item vetoes. In 1665, the Council objected to a proviso exempting certain lands in a Barbados impost act. The objectionable clause was "'disallowed and made void'" by the Council, "although the act itself they confirmed."[24] Similarly, in 1680 the Council reviewed a Virginia revenue act which contained a clause exempting Virginia ships from the taxes imposed. Citing the Barbados act as precedent, the Council confirmed the law but disallowed the exemption.[25]

These two early examples of the exercise of an item veto do not appear to have been repeated. Although Russell does not expressly state that item vetoes were not exercised again, neither he,[26] nor the other authors reviewed by us, mentions any other examples of parts of bills being vetoed.[27] Moreover, Russell states:

> Attempts to impose laws unaltered upon the assemblies, or to repeal acts except in their entirety . . . , were a natural outworking of the policy of Charles II. Both ceased, for the most part, with his reign; while after the "Glorious Revolution" there was a complete tolerance of the assemblies and a fairly scrupulous respect for their autonomy.

---

[22] It should be noted that the Board of Trade first began to review colonial legislation in 1696. Russell at 44

[23] *Id.* at 26–27, Leonard Woods Labaree, *Royal Government in America* 219–22 (1930).

[24] Russell at 21.

[25] *Id.* at 31.

[26] An example stated by Russell of the disapproval of a clause is not properly interpreted as an item veto, but rather as the suspension of the operation of a statute. In discussing several Virginia laws of the early 1680s that were not vetoed but merely suspended in operation while being returned to the colony for reconsideration, Russell describes an act for "Encouragement of Trade and Manufacture" that was returned to Virginia "with an order that the clause fixing the time of its enforcement as to the landing of goods and shipment of tobacco 'be immediately suspended.'" We do not interpret the suspension of the act's effective date as the exercise of an item veto as much as the means by which the act was suspended. Russell explains the suspension of these laws by the fact that the acts involved the important area of trade and were only to take effect in the future. In any event, Russell notes that "the more legitimate course [for the Privy Council], and the one which ultimately prevailed, was that taken in 1685," under which the Council permitted a law to remain in force but instructed the governor to propose an amendment to the assembly. *Id.* at 42–43.

[27] *See e.g*, Oliver Morton Dickerson, *American Colonial Government 1696–1765: A Study of the British Board of Trade in its relation to the American Colonies, Political, Industrial, Administrative* (1912), Leonard Woods Labaree, *Royal Government in America* (1930), Ronald C Moe, *The Founders and Their Experience with the Executive Veto*, 17 Pres. Stud. Q. 413 (1987); Paul R.W. Wolfson, *Is a Presidential Item Veto Constitutional?*, 96 Yale L J 838, 842 n 20 (1987) ("The Privy Council exercised no item veto but always either approved legislation in full or disallowed it in full.").

Russell at 43.[28]

Russell also suggests that item vetoes were viewed unfavorably, and perhaps as illegitimate.[29] He states:

> The governor's commissions and instructions—the nearest approach to a fundamental law in the royal colonies—empowered the governor, council and assembly, under varying restrictions, to make laws which should be subject to royal disallowance. The subsequent demand of the English authorities that the Jamaica assembly adopt unaltered acts drafted in England, constituted a violation of a previous concession which rendered the government's position politically, if not legally, untenable. Other acts of the king in council prior to 1696 were contrary to the fair implications of this grant, if not precluded by its express terms. Such, for example, were the disallowance of clauses in the revenue acts of Barbados and Virginia . . . .

*Id.* at 40–41.

That the few instances of item vetoes were legally problematic and that there is no evidence that they were asserted again suggests that, like the attempt of the Crown to assert the initiative in colonial legislation, the two examples of item vetoes are most appropriately interpreted as novel attempts of the Crown to control colonial assemblies made prior to the firm establishment of rules allocating authority between colonial legislatures and the Crown.[30] Under this interpretation of the historical evidence, the subsequent practice of the Crown until the American Revolution constitutes a significant precedent for a veto power that may be exercised only with respect to an entire legislative enactment.

While there is no evidence that the Crown engaged in the practice of vetoing parts of a bill, Russell's book describes the Crown's use of its power to veto an entire law as a means of inducing the colonial legislatures to remove objectionable provisions. This was accomplished in two different ways. Instead of making a recommendation of confirmation or disallowance to the Privy Council, the Board of Trade might permit a law containing some objectionable provisions to

---

. [28] The proposition that item vetoes were not exercised again is also supported by statements made by the Privy Council, discussed below, that laws combining unrelated provisions were objectionable because elimination of part of the law required a veto of the entire enactment. We should note, however, that there are statements in Russell's book that are to some extent ambiguous, and could possibly be poorly articulated references to item vetoes. For example, Russell writes that a committee of the Privy Council took exception to a provision in the bill of rights passed by the first assembly of New York. Russell at 140; *see also id* at 185. Although we believe that the best interpretation of this statement is not as a reference to an item veto, but rather as an explanation of the grounds for the Privy Council's opposition to the enactment as a whole, we mention it in the interest of thoroughness.

[29] In the case of the item veto of Virginia's revenue exemption, Russell asserts that although the partial disallowance of the act did not violate the immediate instructions from the Crown to the colonial governor, that the Crown "nevertheless felt the weakness of their position is shown by the care with which they cited the Barbadoes act as a precedent." *Id* at 31.

[30] *See* Paul R Q. Wolfson, *Is a Presidential Item Veto Constitutional?*, 96 Yale L J. 838, 842 n.20 (1987).

151

"lye by probationary." The law would be "allowed to stand provisionally while the governor either was instructed to procure an amendment remedying its defects, or to obtain the repeal of the old law and the enactment of a new."[31] Alternatively, the Board of Trade "sometimes secured the same result [as permitting a law to lye by probationary] by disallowing the law and stating specifically in an instruction the modifications which would serve to make it acceptable to the government." *Id.* at 91.[32]

The one example of an item veto cited by Professor McDonald did not involve an item veto, but instead involved an attempt by the Board of Trade to secure an amendment upon a threat of vetoing the entire law. In discussing the Board of Trade's power to permit a law to "lye by probationary," Russell discusses the very example cited by Professor McDonald. According to Russell: "A Massachusetts act of 1764, for example, the Board found objectionable 'in no other respect . . . than as it directs a double Impost . . . for all goods . . . imported by inhabitants of other Colonies.' They accordingly proposed 'an instruction to the Governor for procuring the amendment of this particular clause.'" *Id.* at 55 (ellipsis in original).[33]

The mechanisms employed by the Crown for preventing objectionable measures in otherwise acceptable legislation are analogous to powers that the Constitution clearly confers on the President. If the President objects to objectionable provisions in a law, he may "return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal." U.S. Const. art. I, § 7, cl. 2. Similarly, the President may warn Congress before passage of a bill that it will be vetoed if objectionable provisions are included. This suggests that if the Framers relied on any aspects of the Crown's power to review colonial legislation, it was its power to induce amendments of a law through the threat of a veto.

The Crown's power to veto an entire act was also used to enforce formal requirements on laws passed by the Colonies. The Crown believed that "each separate act should deal with but one subject, and contain no clause foreign in its ti-

---

[31] Russell at 55. Russell states that "[i]n some cases it was stated that, if the request for an amendment were not complied with, the act would be immediately disallowed." *Id.*

[32] Dickerson also discusses the Board's use of its power to disapprove an entire law to induce the Colonies to amend their laws. *See* Dickerson, *supra*, at 232, 237 n.538, 243 n.556, 245 & 263.

[33] Another piece of evidence suggested by Professor McDonald may also be explained as an instance of the Council's practice of using its power to disapprove an entire enactment to induce the colonial legislators to alter parts of it. In his Wall Street Journal article, Professor McDonald states that the Board of Trade "[i]n 1702 . declared its basic policy: Bills 'might be altered in any part thereof.'" We have not found this proposition in Russell's book, but we did find a similar statement In discussing the practice of some Colonies of submitting bills to the Crown for prior approval rather than including a suspension clause in the law, Russell states that "[t]hough such bills were approved, amendments were sometimes suggested by the Board. In 1704 they considered the draft for a revision of the laws of Virginia prepared by the governor and a committee of the council, and suggested many changes to be made before its final enactment " Russell at 92. In a footnote, Russell writes that the "Board informed the attorney and solicitor that these bills might '*be altered in any part thereof* as Bills transmitted from Ireland.'" *Id.* at 92 & n.3 (emphasis added) We do not believe that this is a statement by the Board that it had the authority to veto parts of bills, but rather an assertion of the Board's power to condition prior approval of a bill on alteration of the bill.

152

tle." Russell at 87. The Colonies nonetheless included "provisions upon unrelated subjects within the same enactment." *Id.* at 207. The Crown's response to these practices, however, was to veto the entire measure. Thus, "attempts of the assemblies to re-enact English statutes, or to declare the laws of England wholly or partially in force, were discouraged, lest they operate . . . to deprive the crown of its right to veto each individual enactment." *Id.* at 139–40. A New York law extending several acts of Parliament to the colony

> was disallowed, although it introduced nothing in itself objectionable, because it did not seem fitting that laws should 'be adopted in *Cumulo*, and that, too, without stating more of the acts than the titles and sections adopted. [This] deprives both the Crown and the Governor of that distinct approbation or disapprobation that is essential to the constitution of the Province.

*Id.* at 140 (brackets in original). Moreover, one of the reasons stated by the Crown for objecting to unrelated provisions in an act was that the elimination of part of the act required a veto of the entire measure:

> In 1695 the committee [of the Privy Council] complained that diverse acts of Massachusetts were "joined together under ye same title, whereby it has been necessary for the repealing of such of them as have not been though fit to be confirmed to vacate such others as have been comprehended under such titles."

*Id.* at 207. Thus, even though the Crown believed that laws containing unrelated provisions burdened its power to veto, it did not attempt to exercise its veto over only part of these laws. Rather, the generally accepted view required the Crown to reject the entire piece of legislation.

In conclusion, to the extent that the Privy Council's review of colonial legislation supports any interpretation of the President's veto power, it is that the constitutional provisions enabling the President to threaten to veto, or to veto, an entire legislative measure are his only legitimate response to bills containing objectionable or unrelated provisions.

## E. Experience of the States from 1776 to 1789

We have also sought to review the experience of the States during the period between the Declaration of Independence and ratification of the Federal Constitution. During that period, only the constitutions of Massachusetts and New York provided for vetoes.[34] The experience of these two States, however, is particu-

---

[34] South Carolina's temporary constitution of 1776 provided the State president and commander-in-chief with an absolute veto on legislation. The permanent constitution of 1778, however, did not include the veto power. *See generally* Joseph E. Kallenbach, *The American Chief Executive* 24 (1966)

larly important. Both States' constitutions provided for a strong executive, and were relied on as models by the Federal Convention of 1787.[35] Exercise of the veto in these States, moreover, represents the most recent and proximate example of the veto power known to the Framers, and the only example of a veto that had been drafted and adopted by Americans. Finally, a comparison of the veto provisions in these State constitutions with Article I, Section 7, Clause 2, of the United States Constitution suggests that the delegates to the Philadelphia Convention used the New York, and particularly the Massachusetts, provisions as models in drafting the federal veto provision.[36]

In his article in the *Wall Street Journal*, Professor McDonald refers to the examples of Massachusetts and New York for support. Although Professor McDonald states that the "phraseology of the [veto] provision" in Massachusetts as the power of "revisal" suggests that the veto "could be exercised selectively," he notes that "we cannot be sure because no governor exercised it before 1787." Professor McDonald states, however, that the very first exercise of the veto in New

---

[35] *Id* at 32–33

[36] Article III of the New York State Constitution of 1777 provides.

And whereas laws inconsistent with the spirit of this constitution, or with the public good, may be hastily and unadvisedly passed Be it ordained, that the governor for the time being, the chancellor and the judges of the supreme court, or any two of them, together with the governor, shall be, and hereby are, constituted a council to revise all bills about to be passed into laws by the legislature And for that purpose shall assemble themselves, from time to time, when the legislature shall be convened; for which, nevertheless, they shall not receive any salary or consideration under any pretence whatever And that all bills which have passed the senate and assembly shall, before they become laws, be presented to the said council for their revisal and consideration, and if, upon such revision and consideration, it should appear improper to the said council, or a majority of them, that the said bill should become a law of this State, that they return the same, together with their objections thereto in writing, to the senate or house of assembly, in whichsoever the same shall have originated, who shall enter the objections sent down by the council at large in their minutes, and proceed to reconsider the said bill. But if, after such reconsideration, two-thirds of the said senate or house of assembly, shall, notwithstanding the said objections, agree to pass the same, it shall, together with the objections, be sent to the other branch of the legislature, where it shall also be reconsidered, and, if approved by two-thirds of the members present, shall be a law.

And in order to prevent any unnecessary delays, be it further ordained, that if any bill shall not be returned by the council, within ten days after it shall have been presented, the same shall be a law, unless the legislature shall, by their adjournment, render a return of the said bill within ten days impracticable; in which case the bill shall be returned on the first day of the meeting of the legislature after the expiration of the said ten days.

The Massachusetts Constitution of 1780, ch. I, § 1, art. 2, states:

No bill or resolve of the Senate or House of Representatives shall become a law, and have force as such, until it shall have been laid before the Governor for his revisal, and if he, upon such revision, approve thereof, he shall signify his approbation by signing the same. But if he have any objection to the passing of such bill or resolve, he shall return the same, together with his objections thereto, in writing, to the Senate or House of Representatives, in whichsoever the same shall have originated, who shall enter the objections sent down by the Governor, at large, on their records, and proceed to reconsider the said bill or resolve: But, if, after such reconsideration, two-thirds of the said Senate or House of Representatives shall, notwithstanding the said objections, agree to pass the same, it shall, together with the objections, be sent to the other branch of the legislature, where it shall also be reconsidered, and if approved by two-thirds of the members present, shall have the force of law: But in all such cases, the vote of both houses shall be determined by yeas and nays; and the names of the persons voting for, or against, the said bill or resolve shall be entered upon the public records of the Commonwealth

And in order to prevent unnecessary delays, if any bill or resolve shall not be returned by the Governor within five days after it shall have been presented, the same shall have the force of law.

York "established the precedent that it could [be used to] reject particular clauses as well as whole bills."[37]

The experience of New York State does not support the existence of an item veto. Until 1822, a Council of Revision, composed of the governor, justices of the state supreme court and the chancellor of equity, exercised the veto power in New York. Although Professor McDonald cites the first veto of the Council of Revision as an example of the exercise of an item veto, a review of that veto reveals the Council did not disapprove part of a bill. In fact, the Council rejected the bill as a whole, objecting in its veto message to certain of its provisions.

The Council of Revision exercised its first veto on February 4, 1778, by rejecting a bill entitled, "An act requiring all persons, holding offices or places under the Government of this State, to take the oaths therein prescribed and directed." The Council objected to the bill on various grounds, and returned it to the Senate, where it "was passed again with various amendments, and became a law . . . on the 5th of March, 1778." C. Lincoln, *State of New York, Messages of the Governors* 21 (1909). Lincoln's book, compiling the messages of the Council, states:

> The possible effect of a veto on the powers of the Legislature was considered by the Senate on this occasion, and while consenting to an amendment to obviate the objections presented by the Council of Revision, the Senate declared that neither the concession hereby made to the Council's objection, "nor the amendment aforesaid to be thereon made, shall be drawn into precedent; so as in any wise to impeach, impair, or diminish the freedom of legislation vested in this Senate by the Constitution."

*Id.* Thus, it appears clear that the Council vetoed the entire bill, and it was only after the legislature acquiesced in the Council's views, that the bill was approved and became a law.[38] Rather than providing an example of an item veto, then, the first veto of the Council of Revision demonstrates how the power to veto an entire enactment may be used to induce the legislature to modify objectionable portions of a bill.

A review of the history of the Council of Revision also reveals no evidence that the Council exercised an item veto at any other time. Prescott and Zimmerman's review of the vetoes exercised by the Council of Revision does not mention a single instance in which part of a bill was vetoed, but the article does note

---

[37] Forrest McDonald, *Line-Item Veto· Older Than Constitution*, Wall St. J., Mar. 7, 1988, at 16.

[38] One objection made by the Council was that the Oath of office prescribed for Sheriffs and Under-Sheriffs should not impose a "prohibition to the taking [of] undue fees" merely for certain services, "but ought to extend to all acts which sheriffs, or under-sheriffs, are bound      to perform." Lincoln at 22. The bill that was passed into law was amended to take account of this objection by inserting in the Oath of office that Sheriffs or Under-Sheriffs should not take undue fees "for any other service whatsoever, in [the] said office of sheriff (or under-sheriff . . . )." 1778 N.Y. Laws 14.

examples of entire bills that were vetoed because the Council objected to partic-
ular provisions.[39]

Moreover, the veto provision of the Massachusetts Constitution provides no
evidence that the Framers intended the President to have item veto authority.
First, although the provision in the Massachusetts Constitution conferring veto
power upon the governor uses the terms, "revision," and "revisal," this does not
suggest that the Governor of Massachusetts could exercise an item veto. While
the term, "revision," and its variants, "revise" and "revisal," today imply the act
of correcting or altering an original, two centuries ago these terms meant either
the act of (1) simply reviewing something or (2) reviewing and amending it.[40] It
seems clear that the Framers of the Massachusetts Convention used the term "re-
vision" in the former sense because the veto provision makes sense as a whole
only with this understanding of the term. The provision provides, in relevant part,
that "[n]o bill . . . shall become a law . . . until it shall have been laid before the
Governor for his *revisal*; and if he, upon such *revision*, approve thereof for he
shall signify his approbation by signing the same. But if he have any objection
to the passing of such bill," he is to return the bill and his objections to the leg-
islature. Massachusetts Const. ch. I, sec. 1, art. 2 (emphasis added). If "revise"
is interpreted to mean alteration, then the clause provides the Governor with the
power to alter bills, and denies the legislature the opportunity to override the al-
tered bills. The legislature may, however, override the Governor's veto (*i.e.*, re-
jection without modification) of the entire bill. To avoid this obviously incorrect
interpretation of the Massachusetts veto provision,[41] the terms "revision" and
"revisal" must be understood to mean only the power to review.[42]

Moreover, even if the power of "revision" was intended to permit the Gover-
nor of Massachusetts to modify bills, the President would not possess this power.
Early versions of Article I, Section 7, Clause 2 did use the term "revision," but
the Framers ultimately adopted the clause without it.[43] The Framers did not state

[39] Frank W. Prescott & Joseph F Zimmerman, *The Council of Revision and the Veto of Legislation in New York States 1777-1822* at 53 n.61 (Occasional Paper 1972). The authors note the veto in 1815 of an appropriations bill that "contained a rider providing a new apportionment of senate districts." After the veto was sustained, the "ap-propriations act minus the rider was enacted on the day of final adjournment." *Id.*

[40] The 1828 version of Webster's American Dictionary, defines "revision" as "[t]he act of reviewing, review, re-examination for correction." The verb "revise" has two meanings "1. to review, to re-examine, to look over with care for correction . . 2. To review, alter and amend." N. Webster, *An American Dictionary of the English Language* (1828)

[41] The overall structure of the veto provision in the New York Constitution of 1777 (as well as that of early ver-sions of the veto clause proposed at the Philadelphia Convention) indicates that the term should also be given the meaning "review" in these provisions.

[42] Although Professor McDonald states that the Governor failed to exercise a veto prior to adoption of the United States Constitution, experience in Massachusetts in the years following adoption of the United States Constitution would also have provided evidence of the meaning of the Massachusetts veto provision to the Framers. The veto, however, was not exercised in Massachusetts until after the Governor was inaugurated in 1825. *See* A Nevins, *The American States During and After the Revolution 1775-1789* at 182 (1969)

[43] Madison's Notes at 388 It should also be noted that there is no suggestion in the debates that the power of revision would permit modification of a bill

[44] In addition to the evidence of vetoes exercised under the Massachusetts and New York constitutions, it should be noted that the legislatures in both states passed appropriations bills that aggregated individual items. Therefore, it cannot be argued that the term "Bill" was understood to mean a single item of appropriation

that the President had the power of revision, but merely that he could "approve" or "not" the bills presented to him. Thus, arguments based on the power of revision cannot be used to provide the President with item veto authority.[44]

In conclusion, the history of the veto power in the States of Massachusetts and New York prior to the adoption of the Constitution reveals that item veto authority was not exercised. In our view, this is a significant historical precedent, which constitutes persuasive evidence that the Framers did not intend, or even implicitly assume, that the veto power included the authority to disapprove parts of a bill.

*F. Post-Ratification Experience*

In this section, we review the historical practices of Congress and Presidents as related to the question of whether the Constitution adopts a limited definition of the term "Bill." On balance, the evidence indicates that the Framers did not intend to limit the contents of a bill. The early historical practice of Congress was to pass bills containing numerous items of appropriation. Although Congress did not begin the practice of aggregating unrelated matters in a single bill until the Civil War, since that time it has occurred regularly. Moreover, although Presidents have exercised the veto power differently, they have been unanimous in the view that they were without authority to approve or disapprove parts of a bill.

1. *Appropriations*—A review of appropriations bills passed by the First Congress reveals that numerous items were included within a single appropriations bill. For example, on March 26, 1790, Congress passed "An Act making appropriations for the support of government for the year one thousand seven hundred and ninety." *See* 1 Stat. 104 (1790). Among other things, the act contains appropriations for the payment of pensions, for building a lighthouse on Cape Henry in Virginia, for funding the Department of War, for the expenses of the late office of foreign affairs, for the services and office expenses of Roger Alden, and for the services of Jehoiakim M'Toksin as an interpreter and guide. This bill was by no means unusual, and the statute books are replete with additional examples. Moreover, we are aware of no debates in Congress questioning this practice at the time. Thus, to the extent that the current commentators suggest that a bill may not contain more than one item of appropriation, their claims are contradicted by the highly probative and consistent practice of Congress since its inception; and, as we have already explained, the text of the Constitution forecloses finding item veto authority in the President through any route other than an interpretation of the term "Bill."

2. *George Washington*—This understanding of the veto clauses also appears to have been held by President Washington. During his first term, Washington discussed in a letter why he approved "many Bills with which [his] Judgment is at variance." President Washington explained: "From the nature of the Constitution, I must approve all the parts of a Bill, or reject it in toto." 33 *Writings of*

157

*George Washington* 96 (1940). Although Washington was never presented with an appropriations bill with substantive riders, the fact that he was presented with appropriations bills containing multiple items suggests his belief that he did not have authority to veto individual items of appropriation.

3. *Subsequent Congressional Practice*—The meaning to be drawn from Congress' practice concerning the inclusion in a single bill of unrelated substantive provisions and substantive riders on appropriations bills is more equivocal. It does not appear that substantive legislation was passed by both houses and presented to the President as part of an appropriations bill for the first seventy years following the Constitution's adoption. Attempts to vary from this practice were met with a significant skepticism and debate in Congress, which we briefly describe below.

The issue of combining unrelated provisions was discussed in the Senate in 1850 when Senator Benton moved that the Committee of Thirteen be instructed not to tack any other bill or foreign matter to the bill admitting California as a State. Senator Benton introduced the following resolution:

> That the said committee be instructed to report separately upon each different subject reported to it; and that the said committee tack no two bills of different natures together nor join in the same bill any two or more subjects which are in their nature foreign, incoherent, or incongruous to each other.

Cong. Globe, 31st Cong., 1st Sess. 793 (1850). Senator Benton cited authority for the proposition that in the British system it was considered unparliamentary to tack unconnected bills, and admonished that "the evil of joining incongruous measures together by one House, to coerce the assent of the other, or the approval of the President . . . is just the same." *Id.* at 794. Although the bill in question was not an appropriations bill, Senator Benton cited the parliamentary law of Great Britain in support of his motion. Discussing the British distinction between the tacking of substantive riders to appropriations bills and the tacking of unrelated substantive provisions to each other, Senator Benton observed:

> The case before the Senate is not that of a tax or appropriation bill: if it was, the British argument of unconstitutionality and danger to the country would equally apply; for, by our Constitution, the House of Representatives has the exclusive constitutional right to originate such bills; and to thwart or impede them, by tacking on extraneous amendments in this body, would be to impede the free working of the Constitution; and, in the case of disagreement between them, might deprive the Government of the support necessary to its existence.

Cong. Globe, 31st Cong., 1st Sess. 794 (1850).

It is important for our purposes to emphasize that Senator Benton's remarks were not addressed to what constitutes a "Bill" for constitutional purposes. Rather, he appears to have shared the Framers' concern that one house might tack together two unrelated matters in a single bill. Senator Benton's objection was a different one: the tacking of unrelated matters together would prevent all "part[s] of the legislative power [from acting] freely and fairly—neither the individual members of the two Houses, nor the Houses collectively, nor the President himself. This would be destructive to all fair and wise legislation." *Id.* at 796. Thus, Senator Benton considered tacking to be objectionable precisely because he believed that the President's only recourse was to veto the whole, stating:

> If the two Houses shall agree in the conjunction, the President may not, and may see cause for a veto in one part, and not in the other; but must disapprove all, in order to get rid of the objectionable part.

*Id.*

Confrontation with the House and President was avoided when the Senate tabled Senator Benton's resolution as premature and the Compromise of 1850 permitted the bill admitting California to be passed without the inclusion of unrelated matters.[45]

The question arose again in 1856 when the Republican-controlled House attached to the army appropriations bill a rider prohibiting the employment of the United States military to execute the laws passed by the Kansas territorial legislature. *See* Cong. Globe, 34th Cong., 1st Sess. app. 1089 (1856). The debate focused primarily on the validity of those laws, although some senators viewed the act of tacking on the rider as "revolutionary," again citing parliamentary precedent. *See e.g., id.* at 1103 (Mr. Hunter). Other Senators viewed the rider as merely a condition on the expenditure of funds appropriated by the bill. *See e.g., id.* at 1107 (Mr. Seward). The Senate refused to agree to inclusion of the rider and the Congress adjourned without enacting appropriations for the army.

4. *The Civil War Period*—By the time of the Civil War, however, substantive measures were frequently passed and presented to the President as "riders" on appropriations bills. The Republicans' control of both Congress and the White House, as well as the necessity of quick action, may account for the commencement of the practice. By 1867, however, Congress and the President were frequently at odds, primarily over Reconstruction. In that year, the Radical Republicans in Congress passed an army appropriations bill that included a section purporting to remove the President's authority to control the Army and placing

---

[45] An earlier attempt to tack unrelated bills had occurred in 1820 when the Senate tacked its bill admitting Missouri as a slave State to the bill admitting Maine. After the House protested, a compromise was worked out, and the bills were passed separately.

its management with General Grant. Perhaps because his opponents controlled more than two-thirds of both houses, President Johnson signed the bill. In a special message accompanying the bill, Johnson stated that the substantive provisions of the bill interfered with his constitutional functions as Commander-in-Chief. "Those provisions are out of place in an appropriation act. I am compelled to defeat these necessary appropriations if I withhold my signature to the act. Pressed by these considerations, I feel constrained to return the bill with my signature, but to accompany it with my protest against the sections which I have indicated." 6 James D. Richardson, *Messages and Papers of the Presidents* 472 (1898). This episode shows that neither Congress nor the President believed that a bill could not contain both appropriations and substantive provisions, even though the President recognized that this practice burdened his veto power.

By 1873, the practice apparently had become so common that President Grant called on Congress to propose to the States a constitutional amendment "[t]o authorize the Executive to approve of so much of any measure passing the two Houses of Congress as his judgment may dictate, without approving the whole, the disapproved portion or portions to be subjected to the same rules as now." 7 *Id.* at 242. Again, the fact that President Grant sought an amendment to establish presidential authority to exercise an item veto indicates that he did not believe that the Constitution already provided such authority.

5. *The Hayes Vetoes*—The question arose again at the end of the forty-fifth Congress when the House, now controlled by Democrats, attempted to tack onto certain appropriations a provision repealing part of an election law authorizing the use of federal troops to "keep the peace at the polls." The Republican Senate refused and the Congress adjourned without passing several requisite appropriations. In March 1879, President Hayes called a special session of the forty-sixth Congress to reconsider the needed appropriations. Though the now Democrat-controlled Senate agreed to pass the desired rider as part of the army appropriations bill, considerable debate took place in both houses about the propriety of tacking substantive legislation to appropriations bills. The Democrats argued that it was the Republicans who initiated the practice during the Civil War and that they should not now be heard to object to its use. The Republicans responded that tacking was not unconstitutional unless used to exact presidential approval of a measure that otherwise would be disapproved. According to the Republicans, during their control of Congress, riders were employed only for convenience and not to coerce the President since President Lincoln did not object to the substantive measures attached and the Republicans had the votes in Congress to override any decision by President Johnson to veto such bills. Thus, the Republicans argued that President Hayes' objection to the substance of the rider and the Democrats' inability to override his veto were the precise reasons for the unconstitutionality of the current attempt.

Despite these arguments, the Democrats passed the army appropriations bill with the rider. President Hayes vetoed the bill on the ground that it would establish the principle that the House of Representatives "has the right to withhold ap-

propriations upon which the existence of the Government may depend unless the Senate and the President shall give their assent to any legislation which the House may see fit to attach to appropriation bills. To establish this principle is to make a radical, dangerous, and unconstitutional change in the character of our institutions." 7 *Id.* at 530. President Hayes elaborated:

> The Executive will no longer be what the Framers of the Constitution intended—an equal and independent branch of Government. It is clearly the constitutional duty of the President to exercise his discretion and judgment upon all bills presented to him without constraint or duress from any other branch of the Government. To say that a majority of either or both of the Houses of Congress may insist upon the approval of a bill under the penalty of stopping all of the operations of the Government for want of the necessary supplies is to deny to the Executive that share of the legislative power which is plainly conferred by the second section of the seventh article of the Constitution. It strikes from the Constitution the qualified negative of the President.
>
> . . . .
>
> Believing that this bill is a dangerous violation of the spirit and meaning of the Constitution, I am compelled to return it to the House in which it originated without my approval.

7 *Id.* at 531–32. The rider was then passed separately and vetoed on the merits by President Hayes on May 12, 1879.

Undeterred, Congress tacked similar legislation to a general appropriations bill for the legislative, executive, and judicial departments, which was then vetoed on May 29, 1879. President Hayes stated:

> The objections to the practice of tacking general legislation to appropriations bills, especially when the object is to deprive a coordinate branch of the Government of its right to the free exercise of its own discretion and judgment touching such general legislation, were set forth in the special message in relation to [the army appropriation bill], which was returned to the House of Representatives on the 29th of last month. I regret that the objections which were then expressed to this method of legislation have not seemed to Congress of sufficient weight to dissuade from this renewed incorporation of general enactments in an appropriation bill, and that my constitutional duty in respect of the general legislation thus placed before me can not be discharged without seeming to delay, however briefly, the necessary appropriations by Congress for the support of the Government.

7 *Id.* at 537.

Taking a slightly different approach, Congress next included in an appropria-

161

tions bill for the judiciary a provision prohibiting the use of appropriated funds "to pay any salaries, compensation, fees, or expenses" to enforce the election laws to which it objected. 7 *Id.* at 542. On June 23, 1879, President Hayes vetoed the bill, maintaining that he would not concede "the right of Congress to deprive the Executive of that separate and independent discretion and judgment which the Constitution confers and requires." 7 *Id.* at 544.

Again, on June 30, 1879, President Hayes vetoed a bill making appropriations to pay fees of United States Marshals and their deputies since it would have forbade the executive from making any contract or incurring any liability for the future payment of money that was necessary to enforce certain provisions of the election laws. The President maintained his original position: "The object, manifestly, is to place before the Executive this alternative: Either to allow necessary functions of the public service to be crippled or suspended for want of the appropriations required to keep them in operation, or to approve legislation which in official communications to Congress he has declared would be a violation of his constitutional duty." 7 *Id.* at 546–47.

Finally, on May 4, 1880, Congress again attempted to amend the election laws in "An Act making appropriations to supply certain deficiencies in the appropriations for the service of the Government for the fiscal year ending June 30, 1880, and for other purposes." 7 *Id.* at 591. President Hayes' veto message, in part, was as follows:

> The necessity for these appropriations is so urgent and they have been already so long delayed that if the bill before me contained no permanent or general legislation unconnected with these appropriations it would receive my prompt approval.

> . . . [T]he dangerous practice of tacking upon appropriations bills general and permanent legislation . . . opens a wide door to hasty, inconsiderate, and sinister legislation. It invites attacks upon the independence and constitutional powers of the Executive by providing an easy and effective way of constraining Executive discretion. . . . The public welfare will be promoted in many ways by a return to the early practice of the Government and to the true rule of legislation, which is that every measure should stand upon its own merits.

7 *Id.* at 591–92. Having only a bare majority in each house and realizing that the President would not yield, the Democrats abandoned their attempt and passed the necessary appropriations bills free of substantive riders.

Significantly, although President Hayes characterized Congress' attempts to coerce his approval of objectionable riders as "a violation of the spirit and meaning of the Constitution," his actions demonstrate his belief that his only recourse was to veto the entire bill. The fact that President Hayes subsequently called for

a constitutional amendment to grant the President a line item veto confirms that this was his view.[46]

6. *William Howard Taft*—Writing thirty-five years after the Hayes vetoes, former President and Chief Justice William Howard Taft confirmed that President Hayes followed the only course open to him under the Constitution. Discussing the President and his role in the enactment of laws, Taft observed:

> [The President] has no power to veto parts of the bill and allow the rest to become a law. He must accept it or reject it, and even his rejection of it is not final unless he can find one more than one-third of one of the houses to sustain him in his veto.

William Howard Taft, *The Presidency: Its Duties, Its Powers, Its Opportunities and Its Limitations* 11 (1916). Taft, of course, was not known for taking a niggardly view of executive prerogatives; and that he did not believe that the President possesses an item veto suggests just how extraordinary the exercise of such authority would be.

7. *Woodrow Wilson*—On July 12, 1919, President Wilson vetoed an appropriations bill because he objected to an unrelated provision of the bill that would have repealed the act establishing daylight savings time. The appropriations were necessary to fund the Department of Agriculture during the current fiscal year, which had already begun. In his message, Wilson states, "I realize, of course, the grave inconvenience which may arise from the postponement of this legislation at this time, but feel obliged to withhold my signature because of the clause which provides" for repeal of daylight savings time, a step Wilson believed "would be a very grave inconvenience to the country." 58 Cong. Rec. 2492 (1919). Congress attempted, but failed, to override the President's veto, *see* 58 Cong. Rec. 2551-52 (1919), and subsequently passed the appropriations bill free of the offending rider, *see* Pub. L. No. 66–22, 41 Stat. 234 (1919).

Similarly, in 1919, Wilson exercised the constitutional equivalent of an item veto when he vetoed an appropriations bill on the stated ground that he objected to "certain items of the bill." Specifically, Wilson objected to a section of the bill that appropriated $6,000 for the rehabilitation and support of disabled veterans. According to Wilson, that section "would probably . . . nullify the whole purpose of the [rehabilitation] act and render its administration practically impossible," as "a sum approximating $8,000,000 will be required for the mere support of these men." 58 Cong. Rec. 2493 (1919). Congress subsequently amended the bill to appropriate $8,000,000 for the rehabilitation of veterans, and President Wilson signed it into law. *See* Pub. L. No. 66–21, 41 Stat. 163 (1919).

On each of these occasions, President Wilson demonstrated that if Congress

---

[46] Of course, the Constitution gives the President only a qualified veto, subject to override upon a vote of two thirds of the members in each house. Thus, had the Democrats possessed larger majorities in Congress during their struggle with President Hayes, they might have succeeded in overriding his vetoes.

is unable to override the President's veto, then the President's disapproval of the whole bill may induce Congress to revise legislation according to the President's views. In this way, the exercise of a general veto power may be as effective as an item veto.

8. *Gerald Ford*—On October 14, 1974, President Ford vetoed a continuing appropriations bill because of his opposition to "an amendment requiring an immediate cut-off of all military assistance to Turkey." 10 Weekly Comp. Pres. Doc. 1282, 1283 (Oct. 14, 1974). Although Congress failed to override the President's veto, *see* 120 Cong. Rec. 35,609 (1974), it quickly passed another appropriations bill containing a similar provision. On October 17, 1974, President Ford again disapproved the bill, and again Congress failed to override his veto. Finally, Congress adopted a compromise provision, and the President signed the bill. Although still troubled by the provision, President Ford observed in his signing statement: "As a result of my vetoes of two earlier versions of this continuing resolution, the Congress has eased the most troublesome of the earlier restrictions." 10 Weekly Comp. Pres. Doc. 1321 (Oct. 18, 1974).

9. *Ronald Reagan*—President Reagan has recently had occasion to object to the practice of combining unrelated matters in a single bill. In 1986, he signed H.R. 5363 even though it contained an unrelated and unconstitutional provision that he would have vetoed if it had been presented separately. In his signing statement, the President explained:

> Although I am signing this bill, I am very troubled by the inclusion of an unrelated, last-minute amendment to the Bankruptcy Code. The Congress' decision to link such provisions to otherwise desirable and useful legislation is but one example of the highly objectionable practice of combining unrelated legislation in a single bill. This practice, at a minimum, violates the spirit of the Constitution by restricting the President's veto power.

22 Weekly Comp. Pres. Doc. 1567 (Nov. 14, 1986).

President Reagan has also been presented with numerous appropriations bills which contained objectionable items and riders. Last year's continuing resolution presents many examples. For example, on March 10, 1988, President Reagan asked Congress to consider repealing or rescinding a 46-page list of "wasteful, unnecessary, or low priority spending projects that were included in the full-year fiscal 1988 Continuing Resolution," stating that "[t]hese are projects that, if I were able to exercise line item veto authority, I would delete." President's Message to Congress on Revisions to the 1988 Fiscal Year Appropriations, 24 Weekly Comp. Pres. Doc. 326–27 (Mar. 10, 1988). In his most recent State of the Union Address, President Reagan called on Congress to reform its budget process and avoid presenting him with enormous appropriations bills filled with numerous riders, sometimes just hours before the government is to

run out of money. In fact, President Reagan declared that if Congress presented him with a bill of that sort this year, he would not sign it. 24 Weekly Comp. Pres. Doc. 87 (Jan. 25, 1988).

### III. Alternative Arguments: Analogies to Judicial Review and Impoundment

Some commentators have suggested that item veto authority derives support from the Supreme Court's exercise of judicial review or the President's authority to refuse to spend, or "impound," funds.[47] We discuss each argument in turn.

#### A. *Judicial Review*

The fundamental flaw in the judicial review analogy is that it relates to an entirely different kind of constitutional action which, unlike the item veto, has absolutely nothing to do with the *lawmaking* process. The veto power is a constitutionally prescribed step in enacting a bill into law. In contrast, judicial review is a power which neither derives from any lawmaking authority nor which can have any possible effect on whether something becomes law. Rather, it concerns only a separate and distinct power of the judiciary to determine whether a duly enacted law already in effect comports with constitutional norms and can be subsequently executed or enforced. Accordingly, the judicial power to interpret existing laws says nothing about the President's ability to make law.

Moreover, closer examination of the argument reveals additional, subsidiary problems. In its entirety, Professor McDonald's argument on judicial review appears to be that because the Framers considered vesting the veto power jointly in the President and the Supreme Court, and because when it first exercised judicial review in *Marbury v. Madison*, the Supreme Court struck down unconstitutional portions of the law without invalidating the whole, the President's veto power must also permit him to strike out objectionable portions of a bill without vetoing the whole. The Supreme Court's invalidation of a duly enacted law—or, in certain circumstances, parts of the law—is but a concomitant of the fact that the Court may disturb congressional enactments only to the extent they conflict with the Constitution. While this action provides support for the view that the President may refuse to enforce the unconstitutional portion of a law while executing the remainder, it hardly suggests that the President may enhance his veto authority by striking down, on policy or constitutional grounds, particular provisions of a bill presented. Conversely, if Professor McDonald's analogy to judicial review *were* accepted, then this would suggest that the President may exercise his veto power only on constitutional, and not policy, grounds.

Moreover, defining an item veto by reference to judicial review would permit Congress to circumvent that power. Once the Supreme Court decides that a pro-

---

[47] *See* Stephen Glazier, *Line-Item Veto Hides Under an Alias*, Wall St. J., Mar. 18, 1988, at 26; Forrest McDonald, *Line-Item Veto Older Than Constitution*, Wall St. J , Mar. 7, 1988, at 16.

vision of a statute is unconstitutional, it does not necessarily invalidate only that provision of the statute. Rather, it will uphold the remainder of the statute only upon finding that the offending provision is severable from the rest. *See Alaska Airlines v. Brock*, 480 U.S. 678 (1987). To make this finding, the Court must inquire into whether Congress would have passed the statute absent the offending provision. If the Court concluded that Congress would not have, then the law must be struck down in its entirety. *Id.* at 684–85. Thus, if the analogy between judicial review and the veto is complete, then Congress could easily evade the item veto thus recognized by including a non-severability provision in every bill presented to the President. In that event, the President would be forced to choose between approving or vetoing the bill as a whole—the same choice he has now.

## B. Impoundment

The commentators also suggest that the President's historical exercise of impoundment authority was unchecked until enactment of the Impoundment Control Act of 1974, and, therefore, that past Presidents' failure to exercise item veto authority is explained, not by the absence of such authority, but by their reliance on the somewhat narrower, but more effective, power of impoundment.[48] This argument, however, provides no affirmative support for inherent item veto authority. Rather, at most, it partially rebuts any negative inference to be drawn from the fact that no President has ever asserted or exercised inherent item veto power. Indeed, since impoundment relates only to appropriations, the availability of impoundment does not explain why no President in 200 years has exercised an item veto with respect to non-appropriations matters.

Moreover, to the extent that the commentators are suggesting that the President has inherent, constitutional power to impound funds, the weight of authority is against such a broad power in the face of an express congressional directive to spend.[49] This Office has long held that the "existence of such a broad power is supported by neither reason nor precedent."[50] Virtually all commentators have reached the same conclusion, without reference to their views as to the scope of executive power.[51]

---

[48] The impoundment power is narrower than item veto authority because the former has no application beyond appropriations. The impoundment power is more effective because it is not subject to override.

[49] As discussed below, the President may in some instances decline to spend funds appropriated by Congress in the absence of an express directive to spend. In such cases, however, the President is not exercising an inherent impoundment power, but rather his discretion to direct the manner of executing a law in the absence of a specific congressional mandate.

[50] Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re · Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools* at 8 (Dec. 1, 1969) ("Rehnquist Memorandum"); *see also* Memorandum for Clark MacGregor, Counsel to the President, from Ralph E. Erickson, Acting Assistant Attorney General, Office of Legal Counsel, *Re Constitutional Power of Congress to Compel Spending of Impounded Funds* (Jan. 7, 1972); Memorandum for the Attorney General, from Ralph W. Tarr, Acting Assistant Attorney General, Office of Legal Counsel, *Re · Legal Authority to Take Action to Forestall a Default* (Oct. 21, 1985)

[51] *See, e.g.,* Cathy S. Neuren, *Addressing the Resurgence of Presidential Budgetmaking Initiative,* 63 Tex. L. Rev. 693 (1984); Timothy R. Harner, *Presidential Power to Impound Appropriations for Defense and Foreign Relations,* 5 Harv. J. Law & Pub. Pol. 131 (1982); Note, *Impoundment of Funds,* 86 Harv. L. Rev. 1505 (1973); David A. Martin, *Protecting the Fisc: Executive Impoundment and Congressional Power,* 82 Yale L.J. 1636 (1973).

There is no textual source in the Constitution for any inherent authority to impound. It has been argued that the President has such authority because the specific decision whether or not to spend appropriated funds constitutes the execution of the laws, and Article II, Section 1 of the Constitution vests the "executive Power" in the President alone. The execution of any law, however, is by definition an executive function, and it seems an "anomalous proposition" that because the President is charged with the execution of the laws he may also disregard the direction of Congress and decline to execute them.[52] Similarly, reliance upon the President's obligation to "take Care that the Laws be faithfully executed," Article II, Section 3, to give the President the authority to impound funds in order to protect the national fisc, creates the anomalous result that the President would be declining to execute the laws under the claim of faithfully executing them.[53] Moreover, if accepted, arguments in favor of an inherent impoundment power, carried to their logical conclusion, would render congressional directions to spend merely advisory.

In addition, because an inherent impoundment power, as indicated above, would not be subject to the limitations on the veto power contained in Article I, Section 7, an impoundment would in effect be a "superveto" with respect to all appropriations measures. The inconsistency between such an impoundment power and the textual limits on the veto power further suggests that no inherent impoundment power can be discovered in the Constitution.[54]

Nor has an inherent power to impound been recognized by the courts. Although we are aware of no Supreme Court cases directly on point, *Kendall v. United States*, 37 U.S. 524 (1838), can be read to support the proposition that the executive's duty faithfully to execute the laws requires it to spend funds at the direction of Congress. Further, one lower court, in a decision arising out of the Nixon impoundment controversy, held that at least with respect to the programs before it, the President had no inherent constitutional authority to impound funds in the face of a congressional directive to spend. *National Council of Community Mental Health Ctrs., Inc. v. Weinberger*, 361 F. Supp. 897, 900–02 (D.D.C. 1973), *rev'd sub nom. National Council of Community Health Ctrs. v. Matthews*, 546 F.2d 1003 (D.C. Cir. 1976), *cert. denied*, 431 U.S. 954 (1977).[55] *See also International Union, United Auto, Aerospace and Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 863 (D.C. Cir. 1984) (noting that several courts had rejected either explicitly or implicitly the existence of "inherent constitutional power to decline to spend in the face of a clear statutory intent and directive to do so"), *cert. denied*, 474 U.S. 825 (1985); *State Highway Comm'n v. Volpe*, 479

---

[52] *See* Rehnquist Memorandum, *supra* note 51, at 11; Martin, *supra* note 51, at 1640

[53] Rehnquist Memorandum, *supra* note 50, at 11.

[54] Note, *Impoundment of Funds*, *supra* note 51, at 1514.

[55] In several other cases, although the issue was not always clearly presented, the courts implicitly found that the President has no inherent impoundment authority. *E g* , *Train v City of New York*, 420 U.S. 35 (1975); *City of Los Angeles v Adams*, 556 F.2d 40 (D C. Cir 1977); *Sioux Valley Empire Electric Ass'n v. Butz*, 504 F.2d 168 (8th Cir. 1974).

167

F.2d 1099, 1106 (8th Cir. 1973) (concession by government that congressional directive to spend must be followed).[56]

We recognize, of course, that Presidents have historically impounded funds, starting at least with Thomas Jefferson.[57] Although we have not independently reviewed the circumstances surrounding each such incident, it appears that of those impoundments not based upon the President's foreign policy powers, most occurred under statutes that did not contain a directive to spend, thereby permitting the President to impound in the face of congressional silence. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).[58] Determining whether a statute contains or reflects a congressional directive to spend is a complex question of statutory construction, to be determined on a case-by-case basis.[59]

## V. Recommendation

In this section we outline the ways in which the President may use his existing authority in the lawmaking process to achieve some of the effects of item veto authority. The President has many tools at his disposal. The President may propose legislation to Congress; he may threaten to veto objectionable proposals prior to passage; he may veto legislation and, in effect, offer amendments in stating his objections to Congress, which must be entered at large on the legislative journals of Congress; and he may call Congress into special session on extraor-

---

[56] Although the President has no general inherent authority to impound funds, we believe that there may be instances in which he may impound even in the face of a congressional mandate to spend. For example, Congress does not have the power to compel the spending of funds for an unconstitutional purpose or in violation of specific provisions of the Constitution. Accordingly, the President may impound funds where to spend such funds would infringe upon his constitutional responsibilities as Commander-in-Chief or his duties in the area of foreign affairs.

Moreover, when a congressional directive to spend conflicts with another congressional directive not to spend—as, for example, where Congress has established a debt ceiling that would be violated if the expenditure were made—the President must determine which statute controls in accordance with ordinary principles of statutory construction and, accordingly, in making that determination may conclude that appropriated funds not be spent. *See* Memorandum for the Attorney General, from Ralph W. Tarr, Acting Assistant Attorney General, Office of Legal Counsel, *Re Legal Authority to Take action to Forestall a Default* (Oct. 21, 1985)

[57] *See* Martin, *supra* note 50, at 1644

[58] *See also* Note, supra note 51, at 1507–08, 1510. As noted above, however, in such a case the President is not exercising an inherent impoundment power, but his discretion in the execution of the laws in the absence of a specific congressional mandate

[59] *See, e g.,* 42 Op. Att'y Gen. 347 (1967), Martin, *supra* note 51, at 1645–53.

The adoption of the Impoundment Control Act of 1974, however, may make it doubtful that the President retains some residual authority to impound funds when a statute does not mandate spending.

The Act can be viewed as dividing all appropriations measures into two classes: those that explicitly require that all appropriated funds be spent, to which the Act by its own terms does not apply and over which the President has no residual impoundment authority for the reasons set forth above; and all other appropriations measures, to which the Act does apply and over which the President only has such impoundment authority as the Act grants, to be exercised in accordance with the Act's procedures.

Under this interpretation, the President would in effect never possess any residual authority to impound funds based upon the provisions of a specific statute. We are informed by OMB that it interprets the Impoundment Control Act in that way, and has not claimed that the President has residual authority to impound in those instances where a given statute does not on its face mandate spending

dinary occasions. Together, these powers place the President in a substantial position in the lawmaking process. Just as each house may use its power to shape the form and contents of legislation, so too can the President, subject only to override.

As is now the case, the President should propose desired legislation to Congress. But his role should not end here. In the past, Congress has engaged in the highly objectionable practices of combining an unmanageable number of appropriations bills into one measure, of tacking unrelated substantive riders to such bills, and of combining unrelated substantive provisions in a single bill. All of these practices impede the proper functioning of the President's veto authority. Therefore, he should use that very authority to induce the Congress to abandon or modify these practices. As noted above, President Reagan has already informed the Congress that he will not sign an omnibus appropriations bill for the coming fiscal year, instructing it to pass thirteen separate appropriations bills as provided by the Budget Reform Act. In addition, the President should state publicly that he will not consider, and therefore will veto, any appropriations bills not presented to him within a specified time before the government is to run out of money, calling to the public's attention whenever Congress fails to do so. If Congress argues that circumstances make it impossible to comply, then the President should simply require Congress to simultaneously present him with a separate short-term extension of existing appropriations to give him an equivalent period to review the bill. Similarly, the President should inform Congress that if it engages in its now-routine practice of presenting the President with an omnibus appropriations bill upon adjourning, then he will not only veto the measure, but also exercise his constitutional authority to call Congress back into special session.

Moreover, the President could go a long way towards eliminating the second and third practices by stating publicly that he will veto any appropriations bill containing substantive riders or any substantive bill containing obviously unrelated matters. By adhering to these conditions, the President would provide a strong incentive for Congress to act in an orderly and responsible fashion. For example, last year, after Congress failed to override the President's veto of a bill to codify the Fairness Doctrine, several members of Congress sought to evade the President's veto by attaching the bill as a rider to the Continuing Resolution. President Reagan announced publically that if the rider was included, he would veto the entire Continuing Resolution. *See* Tom Kenworthy, *President Threatens To Veto Money Bills: Contra Aid, Fairness Doctrine Disputed*, Wash. Post, Dec. 19, 1987, at A10. Congress subsequently removed the rider prior to presentment.

Apart from these formal requirements, the President may use his authority in the legislative process to have a greater influence on the contents of legislation. For example, if Congress presents the President with an appropriations bill containing wasteful expenditures, then he should veto the entire measure and identify the objectionable items in his message to Congress, stating that he will approve the bill upon the removal of these items. In this way, the president will focus public attention and scrutiny on those items, and shift responsibility for

failure to enact the remainder of the bill on Congress' decision to include them. Moreover, even if the President's veto is ultimately overridden, his actions will have placed full responsibility for enactment of the objectionable provisions with Congress. Thus, in the case of the last Continuing Resolution, the President might have vetoed it solely on the ground that he objected to the last-minute inclusion of funding for French schools and of a provision designed to divest Rupert Murdoch of particular communications holdings. Given the public disapproval of the inclusion of such provisions, this course could only have enhanced the President's authority. Essentially the same course could be followed with respect to objectionable, albeit related, substantive provisions of a bill.

Although some may argue that assuming such an active role in the lawmaking process improperly intrudes upon the legislative prerogatives of Congress, we believe that the Constitution gave the President these powers to enable him fully to participate in the legislative process, and to defend that role. Indeed, throughout history, chief executives have used their authority in the lawmaking process precisely in these ways and with these effects. Hence, it may be premature to suggest that the President's existing authority is so inadequate as to suggest inherent item veto authority before the President has fully exercised his existing authority.

## Conclusion

For the foregoing reasons, we conclude that the recent claims that the Constitution grants the President inherent item veto authority are not well-founded. On the other hand, our review suggests that vigorous use of the President's general veto power may alleviate much of the difficulties that give rise to calls for enhanced authority.

CHARLES J. COOPER
*Assistant Attorney General*
*Office of Legal Counsel*
